[No. S005780. Nov. 23, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
THEODORE JOHN WREST, Defendant and Appellant.

**COUNSEL**

William J. Kopeny, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, John Gorey, Susan Lee Frierson and Tricia Ann Bigelow, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

LUCAS, C. J.—This is an automatic appeal from a judgment of death. Finding no reversible error, we affirm the judgment in its entirety.

## FACTS

### *Appellant's Guilty Plea and Its Factual Basis*

In an amended information, appellant was charged in the following counts: count I, the murder of Virginia Aceves (Pen. Code, § 187; all undesignated statutory references are to this code), personal use of a deadly or dangerous weapon (§ 12022, subd. (b)), and allegations of three special circumstances—multiple murder (§ 190.2, subd. (a)(3)), robbery-murder (§ 190.2, subd. (a)(17)(i)), and rape-murder (§ 190.2, subd. (a)(17)(iii)); count II, the murder of Nancy Croom (§ 187), personal use of deadly or dangerous weapon (§ 12022, subd. (b)), and a special circumstance allegation of rape-murder (§ 190.2, subd. (a)(17)(iii)); and, count III, the attempted murder of Kimi Marie Hansel (§§ 187, 664), the personal use of a deadly and dangerous weapon (§ 12022, subd. (b)), and an allegation that appellant inflicted great bodily injury upon the victim (§ 12022.7).

In eight additional counts (IV through XI), appellant was charged with burglary (§ 459), rape (§ 261, former subd. (2)), robbery (§ 211), and weapons enhancements (§§ 12022, subd. (b), 12022.5), including firearm (§ 12022, subd. (a)), and habitual criminal (§§ 667, subd. (a), 1192.7, subds. (c)(18), (23)) allegations.

Appellant initially pleaded not guilty and denied all special allegations; his motion to sever the case into three trials was denied, but the murder charges were severed from the remaining counts. Appellant's case proceeded to trial on the murder charges (counts I, II, and III) and related special allegations. After 11 court days of voir dire and examination, a jury was death qualified and impaneled to try the cause. On the afternoon before the jury was impaneled, appellant withdrew his plea of not guilty and entered a plea of guilty to the first degree murders of Virginia Aceves and Nancy Croom and to the attempted murder of Kimi Hansel (counts I, II, and III). He also admitted all special-circumstance allegations, the weapons enhancements on the first three counts, and the great bodily injury allegation on count III.[1]

The evidence at the preliminary hearing, which the parties stipulated contained the factual basis for appellant's pleas of guilty and admissions of special circumstances, reveals the following: On the evening of March 6, 1987, appellant stabbed three women within the radius of a few blocks on

---

[1]After the penalty phase trial and verdict, appellant withdrew his previously entered plea of not guilty to count V (rape), entered a plea of guilty to that count, and admitted the weapon enhancements. The remaining counts—IV, VI, VII, VIII, IX, X, and XI—were dismissed.

the streets of Santa Barbara. Two of the women died; a third was permanently paralyzed.

Nancy Croom, 47, was found dead, naked from the waist down, under the hoist area in an automobile transmission shop. She suffered a total of 33 stab wounds to her head, neck, face, and back. Her body had been dragged to the shop from the steps of a nearby church, where her purse and personal belongings were found.

Approximately one hour before she was killed, Croom was with appellant and another man, sitting in the doorway of the Santa Barbara Community Center drinking wine. Croom's brother-in-law, a homeless person named John Logan, stopped to talk with them. He saw appellant lick Croom's nose and heard him say to her: "I'd like to come all over your body." Croom pushed appellant back, threw wine on him, and retorted: "I don't want to hear it." Appellant replied: "That's not how you acted when I bought you the mickey of wine." When Croom responded she was married, appellant fell back against the wall and remarked: "She never even told me she was married." A man matching appellant's description was later observed by witnesses chasing a woman of Croom's description down the street in the same area.

While walking down the alley toward her apartment, Kimi Marie Hansel, a 22-year-old waitress and part-time student, heard appellant running behind her. Before she could turn around, appellant hit her in the middle of the back, pushing her five feet forward and knocking the wind out of her. Appellant called her a "bitch" and hit and stabbed her repeatedly until she momentarily lost consciousness. As he dragged her on her back by her wrists, appellant asked Hansel to look up at him. Smiling, he remarked to her: "You are not going to live long, are you?" When she did not respond, he stated: "Now, I'm going to take you in the bushes and fuck you." Hansel felt her body drop and again lost consciousness. Although Hansel survived appellant's attack, one of the stab wounds he inflicted transected her spine, paralyzing the right side of her body.

After attacking Hansel, appellant encountered a third victim, Virginia Aceves, age 55, as she was entering the alley. Steve Putnam, a friend of Hansel's who was coming to her house, saw appellant and Aceves struggling in the alley. Aceves was crying: "Please don't do this." Putnam saw appellant stab Aceves in the neck. Putnam grasped his bike chain and approached appellant. Knife in hand, appellant pivoted and told Putnam to get out. Appellant then ran down the alley, holding his knife and something else in his hands. Putnam proceeded down the alley, observed Hansel's body, but

did not recognize her, and then called police. A police search of the area revealed, among other things, a trail of personal items belonging to Aceves running for two blocks from the alley, including a wallet, purse, and perfume samplers. No money was found in the wallet or purse, or along the trail. Appellant's fingerprints were found on the perfume samplers.

Aceves suffered 12 knife wounds. Her death was caused by a sharply incised stab wound inflicted with considerable force in the left temporal region of the brain. The wound pierced the skull and severed the medulla from the pons, effectively separating her brain into two pieces.

### The Penalty Phase

At the penalty phase, the prosecution introduced evidence of three uncharged violent criminal acts committed by appellant. In 1979, while a freshman in high school, appellant secretly entered the house of Eleanor Smith Bolin, a high school English teacher who lived in his neighborhood, placed a stocking over his head, and hid in her closet. When Bolin came home, he surprised her by jumping out of the closet with a 28-inch fireplace shovel raised over his head and a knife in his hand exclaiming: "I am going to kill you." After a struggle during which appellant brought the knife against Bolin's chest and repeated his threat to kill her, Bolin struck him in the face and he fled. After appellant left, Bolin observed a number of unusual things inside the house. A piece of cotton rope, which was kept in a drawer in the garage, was found under a cushion on the living room couch. The couch was approximately 36 feet away from the area where appellant surprised Bolin. A bottle of ammonia and a washcloth taken from the utility room were also found in the living room. After the attack, Bolin stayed with her parents and friends until she moved back into her house. Eventually, she sold the house and moved away. Bolin testified to continuing emotional trauma from appellant's attack.

In 1982, appellant entered the house of Rose Peck at 6:25 a.m. With a pole in his hand, he exclaimed he was going to kill Peck and her daughter. Peck had two daughters, ages four and eleven, who were in the house at the time. In a 25-minute struggle, appellant struck Peck with the pole several times. Appellant demanded money and, at Peck's invitation, took $5 from the top of the dresser and left. Peck's four-year-old daughter witnessed the struggle, screaming: "Quit hitting mommy. Leave my mommy alone." Peck's older daughter hid in a bedroom closet. Peck suffered a black eye and a large bruise on her left leg as a result of appellant's attack.

In 1987, appellant, armed with a rifle, entered the home of Shannon Page Alton at 9 a.m. Finding Alton home alone and in bed, he said: "I won't hurt

you. I just want money." He put a sock in her mouth, tied another sock around her wrists, and tied her feet together with pantyhose. He told her he had previously been in her house and had taken money. He again assured Alton he would not hurt or rape her. After going through the drawers and cabinets in the kitchen, appellant returned to the bedroom, holding a butcher knife. He forced Alton into the closet and raped her. He then combed his hair, put on a jacket he had taken from the closet, and looked at himself in the mirror. After appellant left, police found the rifle outside the Alton residence. The rifle had been taken during a burglary; appellant's fingerprints were found on an ammunition box at the scene of the burglary.

Judith Eileen Cummins, appellant's sister, testified on his behalf, as follows: Appellant's father died when he was two years old. Appellant had difficulty with speech and did not begin talking until he was three. He was ridiculed by classmates and companions for his speech and his family's poverty. At age 12 he stole an automobile. Appellant had a poor self-image and developed increasing anger and frustration during his teens. Cummins believed appellant should not be executed because he had never been given a chance in life.

## DISCUSSION

### I. Appellant's Guilty Plea

Appellant pleaded guilty in open court after signing an eight-page written waiver form. The form, entitled "Waiver of Constitutional Rights and Plea of Guilty or 'No Contest,' " included printed, numbered paragraphs initialed by appellant describing the rights he waived and the consequences of his plea and the signatures of appellant and his attorney. By executing the form, appellant represented he had personally initialed the paragraphs and discussed them with counsel and he understood each of the rights described in the form and waived them in order to enter his plea.

Appellant initialed paragraphs stating he offered an unconditional plea of guilty to the described charges and affirmed his knowledge of the consequences of such a plea, i.e., that a penalty trial would take place in which the only possible outcomes were life in prison without possibility of parole or the death penalty and that each of appellant's pleas could be considered, individually and collectively, as aggravating circumstances in assessing the appropriate penalty. He also initialed separate paragraphs evincing his understanding and waiver of specifically described constitutional rights to jury trial, to confront witnesses, to testify or refuse to testify, and to call witnesses. Finally, he affirmed in the waiver form that he had discussed his plea

with counsel, informed counsel of all facts and circumstances of the case known to him and received legal advice as to his rights, and voluntarily elected to plead guilty because he was guilty or believed there was sufficient evidence to prove his guilt beyond a reasonable doubt.

Appellant's attorney also signed the form, affirming he had explained appellant's rights to him, discussed possible defenses with him, found a factual basis for appellant's plea, and concurred in appellant's decision to plead guilty. By their signatures, both appellant and his attorney also represented that no promises or threats had been made to obtain the guilty and special circumstances pleas.

After reviewing and executing the waiver form, appellant and his attorney appeared in open court. Before accepting appellant's plea, the trial judge asked the prosecutor to review the form with appellant on the record and informed appellant he was free to consult with his attorney at any time if he had any questions about the waiver of his rights. In response to questions from the prosecutor, appellant reaffirmed his signature and initials on the waiver form. The prosecutor asked appellant about each count, enhancement, and special circumstance and obtained appellant's express assurances that he understood a penalty trial would be held and that his pleas would be used as aggravating circumstances to determine whether the penalty would be death or life in prison without possibility of parole. In addition, the prosecutor explained each of appellant's constitutional rights; appellant reaffirmed on the record his understanding and voluntary waiver of each right.

After the prosecutor's questions, the court interrogated appellant, verifying appellant's understanding that he would be "stuck with" and unable to withdraw his pleas at a later date and that, regardless of the pleas, the prosecutor would be able to present all the evidence about all of appellant's crimes to the jury at the penalty phase. At the close of the interview, appellant responded "guilty" to each of the charges and "admit it" to each of the special circumstance allegations. The trial court accepted the pleas and admissions, specifically finding they were voluntarily made after a valid waiver of appellant's constitutional rights.

■ Under both the state and federal Constitutions, a valid plea of guilty must be preceded by a knowing and voluntary waiver of defendant's rights. "[T]he record must contain *on its face* direct evidence that the accused was aware, or made aware, of his right to confrontation, to a jury trial, and against self-incrimination, as well as the nature of the charge and the consequences of his plea." (*In re Tahl* (1969) 1 Cal.3d 122, 132 [81 Cal.Rptr.

577, 460 P.2d 449], italics in original; see also *People* v. *Howard* (1992) 1 Cal.4th 1132, 1174-1180 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) "No specific formula is required, as long as the record shows by direct evidence that the accused was fully aware of his rights." (*People* v. *Cooper* (1991) 53 Cal.3d 771, 839 [281 Cal.Rptr. 90, 809 P.2d 865].) The California Constitution also provides that a jury may be waived "by the consent of both parties expressed in open court by the defendant and the defendant's counsel." (Cal. Const., art. I, § 16.) Finally, under section 190.4, subdivision (a), special circumstance issues are to be tried by jury "unless a jury is waived by the defendant and by the people."

Appellant contends the record does not establish a knowing, intelligent, and voluntary waiver of his right to jury trial as required by the constitutional and statutory provisions just cited. ■ Initially, he maintains that the on-the-record proceedings failed to inform him the jury would have to be convinced of his guilt of the crimes "beyond a reasonable doubt." Appellant cites no authority that such an admonition is required; we are aware of no such authority and perceive no reason to impose a required admonition in the form proposed by appellant.

■ Second, appellant argues there must be a waiver of jury trial on the special-circumstance allegations, separate and distinct from the crimes charged, citing *People* v. *Memro* (1985) 38 Cal.3d 658, 700-705 [214 Cal.Rptr. 832, 700 P.2d 446]. In *Memro*, the trial court accepted a stipulation to a court trial of a special-circumstance allegation without any on-the-record expression by defendant of a jury waiver. We held that a separate, personal waiver from defendant was required. In contrast with *Memro*, such a separate, personal waiver occurred in this case. Among the questions and answers in the on-the-record colloquy between appellant and the prosecutor appear the following:

"[The Prosecutor]: You understand you have a right to a trial by jury, which means that 12 citizens selected by your lawyer and by myself would hear all the facts of this case and decide whether or not you were guilty of the charges, the enhancements, *the special allegations, or any other special allegations that are charged in this particular case?*

"Do you understand that?

"*The Defendant: Yes.*

"[The Prosecutor]: All 12 citizens would have to agree that you were guilty in order to be convicted of any charge against you. And all 12 citizens

would have to agree that you are not guilty in order to acquit you. And all twelve would have to agree of [*sic*] any enhancements, prior prison terms, *any serious allegations, or the special circumstances.*

"*Do you understand that?*

"*The Defendant: Yes.*

"[The Prosecutor]: By initialing that box [indicating the jury waiver box on the waiver form] you're indicating that you did hereby waive and give up your right as to the charges we've discussed earlier, any enhancements *and special allegations that we've already talked about; is that right?*

"*The Defendant: Yes.*

"[*The Prosecutor*]*: In other words, you don't want a jury trial on the issue of guilt or the special circumstances or the enhancements, right?*

"*The Defendant: Right.*

"[The Prosecutor]: And you've discussed that with your lawyer, Mr. Cannon?

"The Defendant: Yes." (Italics added.)

The dialogue set forth above, considered in light of the remainder of the record preceding the acceptance of appellant's plea, reflects an express and personal understanding and waiver of appellant's right to jury trial on the special circumstance allegations. The mere fact that the prosecutor's questions combined issues of guilt, special circumstances, and enhancements did not vitiate the waiver. As in *People* v. *Diaz* (1992) 3 Cal.4th 495, 565 [11 Cal.Rptr.2d 353, 834 P.2d 1171], defendant was made aware that "the waiver of his right to trial by jury applied to *all* aspects of his special circumstances case, from beginning to end" and defendant himself informed the court that he had taken advantage of the opportunity to discuss the issue of jury-trial waiver with defense counsel. (*Ibid.*, italics in original.) Under these circumstances, no more was required to meet constitutional or statutory standards. (See also *People* v. *Simpson* (1991) 2 Cal.App.4th 228, 233-237 [2 Cal.Rptr.2d 589].)

Certain other appellate decisions, including *People* v. *Sandoval* (1987) 188 Cal.App.3d 1428, 1431 [234 Cal.Rptr. 97], *People* v. *Gastile* (1988) 205 Cal.App.3d 1376, 1380-1381 [253 Cal.Rptr. 283], and *People* v. *Moreno*

(1991) 228 Cal.App.3d 564, 571-572 [279 Cal.Rptr. 140], might be read to state or imply that our decision in *Memro*, (*supra*, 38 Cal.3d at pp. 700-705) somehow demands that a defendant's waiver of his jury-trial right on special circumstance allegations be taken in accordance with a prescribed ritual, e.g., a separate interrogation of defendant about his special circumstance jury trial rights as distinct from his other jury trial rights. As we have explained, *Memro* does not so hold. It simply requires that a valid waiver of the jury-trial right on a special circumstance actually cover the special circumstance. It does *not* require such a waiver to be taken in accordance with any particular procedure. To the extent the appellate decisions just cited hold or suggest to the contrary, they are disapproved.

■ Third, appellant maintains the court's finding of waiver is invalid because, immediately after the questions and answers set forth above, appellant responded "no" when the prosecutor asked: "You feel like you know all the ins and outs of that [i.e., jury trial], do you?" While it might have been preferable for the prosecutor or the trial judge to have explored the reasons for appellant's cryptic negative answer in this regard, any failure to do so did not prejudice his rights. There is no constitutional requirement that appellant understand "all the ins and outs" of a jury trial in order to waive his right to one. The record contains a complete description of the essential elements of jury trial as conveyed to appellant as well as affirmation of his express understanding of those elements and his desire nonetheless to enter a plea of guilty and to admit the special-circumstance allegations.

For the reasons stated above, there was no error in the receipt by the trial court of appellant's waivers and plea of guilty.

## II. The Prosecution's Penalty Phase Argument

Appellant points to six examples of allegedly improper argument by the prosecutor. ■ At the outset, by failing to interpose any objection at trial, defendant waived any error or misconduct emanating from the prosecutor's argument that could have been cured by a timely admonition. (*People* v. *Morris* (1991) 53 Cal.3d 152, 220 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Daniels* (1991) 52 Cal.3d 815, 891 [277 Cal.Rptr. 122, 802 P.2d 906].) As shown below, even assuming error or misconduct, each of appellant's examples could have been so cured.

■ Initially, appellant faults the prosecutor for arguing deterrence as a basis for imposing the death penalty. The prosecutor's argument included the following remarks:

"So this will be the last time . . . you will have to listen to me in this particular trial."

"So, I had to edit things out, because if I wanted to say everything I could to you, it would be beyond your limits of endurance and probably beyond mine, too. So I made some decisions, and they're right or wrong, on behalf of my client."

"I could talk to you about Scripture and verse from the Old Testament that supports capital punishment. But I'm not."

"And I could talk to you about the fact that the death penalty plays an indispensable role in the justice system as a deterrent for crime, but I'm not. There are statistics that could be cited for either side as to that."

"But as to the deliberations and what you should decide as to whether the defendant, Theodore John Wrest, should live or die, they don't make a difference."

"I could read you testimonials on the part of the people who have been convicted of serious crimes who said they stopped doing their crimes because of fear of the death penalty. But I'm not."

"And I'm not going to stand here and philosophically debate whether the merits of life without possibility of parole is probably a worse penalty than death. I'm not going to insult your intelligence by making that argument because we all know why it isn't or otherwise we'd have more people being asked to be executed in the State of California and we wouldn't be going through this process."

"And I'm not going to sit here and talk about rehabilitation and the role it could play."

"I'm not going to talk about the fact of whether the death penalty could provide someone with the opportunity to repent at the time of death or whether a long stay in prison will allow somebody to find God or find rehabilitation."

■ An argument that the death penalty should be imposed upon a particular person because of the deterrent effect it would have on others is generally inappropriate because it " 'addresses the minds of the jury to the deterrence of designated "potential killers" rather than the penalty to be adjudged to the defendants. . . . The sought imposition of the death penalty thus rests upon the unproven and illegitimate assumption that it acts as a deterrent to the described "potential killers" . . . . ' " (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1105 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v.

*Purvis* (1963) 60 Cal.2d 323, 341-342 [33 Cal.Rptr. 104, 384 P.2d 424].)

■ Moreover, the prosecutor's reference to Old Testament support for capital punishment was improper—such an argument tends to diminish the jury's sense of responsibility for its verdict and to imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions. (See, e.g., *Commonwealth* v. *Chambers* (1991) 528 Pa. 558 [599 A.2d 630].)

■ Although the prosecutor's comments here were strategically phrased in terms of what he was *not* arguing, they embody the use of a rhetorical device—paraleipsis—suggesting exactly the opposite. Repetition of the statement, "I am not arguing *X*," strongly implied the prosecutor was in fact asserting the validity and relevance of *X*, but, for lack of time, was concentrating on other, presumably more important topics.

When considered in context, however, the prosecutor's remarks were not prejudicial.[2] The brief reference to deterrence was immediately undermined by the prosecutor himself, who represented that evidence existed on both sides of the issue and then immediately reminded the jury of its duty to judge this defendant as an individual in the context of his crimes. The reference came in the course of a long argument, the bulk of which was properly and specifically focused on the factors in aggravation and mitigation. Where, as in this case, "the prosecutor . . . frankly acknowledged the weakness of the deterrence theory as applied to the death penalty" a brief reference to that topic was "undoubtedly harmless and could not have affected the jury's verdict." (*People* v. *Ghent* (1987) 43 Cal.3d 739, 770 [239 Cal.Rptr. 82, 739 P.2d 1250].) The same can be said of the prosecutor's brief reference to Scripture, which was totally undeveloped in the course of the argument.

■ Appellant also points to several exhortations in the prosecutor's argument to "imagine" what was going through the minds of the victims and "to consider what impact [appellant's acts] had upon the victims in this particular case. Six separate victims that can never, never have those memories taken away." The argument was proper. The impact of a capital

---

[2] Appellant asserts the prosecutor continued to press a deterrence theme throughout his argument, pointing to two passages in addition to the one quoted above. He takes both passages out of context. Although the prosecutor did state that "giving the defendant the death penalty will restore a certain confidence and trust in the system's ability to deal with people who transgress it," he did so as part of an argument that defendant's crimes were "so aggravated that it outweighs any mitigating circumstances here, so that the community and so that the people know there is more to justice, that the penalty must fit the crime." In addition, the prosecutor's reference to delivering a "message" to "the rest of the people" was followed by an immediate reference to defendant: "The message is: 'Mr. Wrest, we have a death penalty in California and it's applicable in certain cases and under certain facts, but, Mr. Wrest, you didn't cross that line.' " Neither of these passages contains an impermissible argument based on deterrence of others.

defendant's crimes upon victims can be considered by a penalty phase jury. (*Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 839 [1 Cal.Rptr.2d 696, 819 P.2d 436].) As a part of victim impact argument, the jury can be urged to put itself in the shoes of the victim. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 536 [268 Cal.Rptr. 126, 788 P.2d 640].)

 Appellant maintains the prosecutor prejudicially misstated the evidence in his opening statement at the penalty phase, citing eight supposed instances of misconduct in this regard. No objection was made to any of these instances at trial; appellant fails to demonstrate that, assuming misconduct, an admonition would have been an ineffective remedy. Moreover, remarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor "was 'so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted.' " (*People* v. *Martinez* (1989) 207 Cal.App.3d 1204, 1225, fn. 5 [255 Cal.Rptr. 691].) As shown below, in each case, the variance between prosecutorial statement and actual proof is minor or nonexistent. In no case can an inference of misconduct be drawn.

Appellant first claims the prosecutor falsely maintained that one victim, Eleanor Smith Bolin, lived in a house she had built for herself, on the assumption she would never be married. Ms. Bolin testified that at the time of the attack, she was single, lived alone, and had built her own home. Appellant also claims there was no evidence to support the prosecutor's statement that Bolin was so frightened after appellant's attack that her parents stayed with her, she then stayed with friends, and later moved out of the house. Ms. Bolin testified her parents stayed with her at her request on the evening after the attack. Thereafter, she stayed with her parents and friends until she moved back into her house, where she stayed by herself for some unspecified time before selling the house.

The prosecutor stated that another of appellant's victims, Mrs. Peck, suffered a swollen black eye and lost part of her sight in that eye. Mrs. Peck testified that appellant hit her "really hard" in the left eye, blackening that eye. She also testified to serious spinal and back injuries. The prosecutor also described Ms. Croom's life as "hard" and referred to her "little room." Witness John Logan testified that Ms. Croom was a "street person who wandered the streets" and stayed in a hotel.

The prosecutor stated Robert Gilmore, a person whom appellant allowed to enter Salvation Army facilities where appellant was living, would testify

that appellant left town immediately after the murders and hid in Santa Monica for several weeks. Gilmore actually testified that appellant unlocked the door of the Salvation Army facility and allowed Gilmore to sleep in the chapel on the night of the murders. According to Gilmore, appellant told him he would return at 5 a.m. to let him out of the chapel before anyone noticed his presence. Appellant did not appear as promised. When Gilmore next saw appellant several weeks later, appellant explained he had "gone south," which Gilmore thought meant Santa Monica or Huntington Beach.

The prosecutor also said Gilmore would testify appellant was "not particularly intoxicated" when Gilmore last saw him on the night of the murders; Gilmore testified that appellant was intoxicated "to some degree."

The prosecutor stated that John Logan would testify Nancy Croom flirted with appellant to induce him to buy her a bottle of wine. Mr. Logan testified that he saw appellant and Ms. Croom together in front of the Filipino Community Center in downtown Santa Barbara. When appellant made sexual overtures toward Ms. Croom she pushed him back, threw wine on him, and said, "I don't want to hear it." Appellant replied: "That's not how you acted when I bought you the mickey of wine."

Finally, the prosecutor stated that what Kimi Hansel thought were blows to her back and other parts of her body were actually eight stab wounds. Appellant complains the record does not show the number of stab wounds suffered by Ms. Hansel. It does, however, reveal she had received, at appellant's hands, "multiple stab wounds around her neck, upper shoulder, left arm, left wrist," including "an almost lethal puncture wound" in the back of her neck. Ms. Hansel testified she received what she thought were "hard hits" to her back.

As these examples show, every claim of misconduct made by appellant involves either a permissible argument from the evidence or a minor deviation therefrom. Even assuming one or more of appellant's claims constituted error or misconduct, he is not entitled to reversal of the penalty phase judgment. ▮ "[P]rosecutorial misconduct in an opening statement is not grounds for reversal of the judgment on appeal unless the misconduct was prejudicial or the conduct of the prosecutor so egregious as to deny the defendant a fair trial." (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1080 [255 Cal.Rptr. 352, 767 P.2d 619].) ▮ In this case, no objection was made to any of the alleged instances. The jury was informed that the prosecutor's opening statement was not evidence. Any inconsistency between the opening statement and the evidence was inconsequential. Appellant was permitted to confront all witnesses and to challenge and rebut all evidence offered against

him. Under these circumstances, appellant suffered no conceivable prejudice. (*People* v. *Barajas* (1983) 145 Cal.App.3d 804, 809 [193 Cal.Rptr. 750].)

■ Appellant next accuses the prosecutor of introducing evidence of nonviolent criminal activity (two burglaries and theft of a gun) in aggravation of his violent crimes. Although the jury heard of appellant's burglary of the Alton residence, the evidence emanated from statements made to Ms. Alton by appellant himself during his violent attack on her. As appellant tied and gagged Ms. Alton, he told her he had been inside her house before, at a time when she was home, and had taken $10 from the kitchen counter. Appellant blamed Ms. Alton's husband, who he claimed had left the garage door open, for facilitating the commission of his crime. This evidence was properly admitted for the purpose of showing the context of appellant's violent crime; the jury could reasonably infer appellant's statements were made to induce fear in his victim. (*People* v. *Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741].)

The jury also heard evidence, in the form of a stipulation, that the rifle appellant used in his attack on Ms. Alton and left in her yard was stolen during a burglary at Hope Ranch some time before the attack. Appellant's fingerprints were found on an ammunition box at the scene of the Hope Ranch burglary. This evidence was also properly admitted for an independent purpose—to show appellant's identity as Ms. Alton's attacker.

Contrary to appellant's view, the prosecutor did not refer in final argument to appellant's nonviolent crimes as evidence in aggravation. Both the prosecutor, in argument, and the court, in instructions, referred to the three identified episodes of violent crime as the aggravating evidence. No other crimes or incidents were mentioned by the prosecution in this regard. (*People* v. *Melton*, *supra*, 44 Cal.3d at p. 757.)

■ Appellant next contends the prosecutor incorrectly informed the jury it must decide the issue of penalty as a group, without resort to individual opinions and beliefs. To the contrary, the prosecutor's few references to "the jury," to deliberations "as a jury," and to "the 12 of you" in no way implied that each juror was not to make an individual decision. The court instructed that both the People and the defendant were "entitled to the individual opinion of each juror" and that: "Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and instructions with the other jurors." It also charged the jurors they were not to be "influenced to decide any question in a particular way because a majority of jurors, or any of them, favor such a decision." The prosecutor himself

asked the jury to rely on the court's instructions rather than his own statements. No error or misconduct occurred.

 Finally, appellant argues that the prosecutor told the jury that the death penalty should be imposed simply because appellant had admitted the special-circumstance allegations. Appellant takes the prosecutor's remarks out of context. Although the prosecutor implied that appellant had "crossed the line" between murders with special circumstances and other murders, he also stated that crossing that line was essential for appellant "to be eligible" for the death penalty in California. Moreover, the court's instructions emphasized the jury was to decide which of the alternative penalties—life in prison without possibility of parole or death—was to be imposed on appellant in light of the aggravating and mitigating factors as shown by the evidence. In the absence of anything in the record to the contrary, we presume the jury followed these instructions. (*People* v. *Frank* (1990) 51 Cal.3d 718, 728 [274 Cal.Rptr. 372, 798 P.2d 1215].)

 We have also considered appellant's contention that he was denied a fair trial by the cumulative effect of the allegedly improper arguments set forth above. Each of appellant's claims lacks merit, was waived, or was clearly harmless beyond a reasonable doubt. Their cumulative effect did not infringe on any of appellant's state or federal constitutional, statutory, or other legal rights. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1249 [283 Cal.Rptr. 144, 812 P.2d 163].)

### III. Penalty Phase Jury Instructions

During penalty phase deliberations, the jury submitted to the court the following inquiry:

"Is the jury allowed to develop mitigating circumstances that were not explicitly presented in the courtroom by making inferences based upon other evidence or testimony?

"For instance, can the jury attempt to develop the state of mind of the defendant by inference from other evidence in spite of the fact that the defense did not specifically make a claim covering or presenting direct evidence of the state of mind of the defendant?"

After consultation with counsel and with the express agreement of appellant's trial attorney, the court instructed the jury as follows:

"Now, obviously, the mitigating circumstances are set forth in the instructions that you have. I can't elaborate on the instructions. I can say that the

jury is entitled to draw reasonable inferences—the key word is reasonable inferences—from the evidence that's been presented. But, the jury is not entitled to speculate."

■ Appellant initially asks us to construe the court's answer, which referred the jury to previous instructions, including an expanded section 190.3, factor (k) instruction (CALJIC former No. 8.84.1), as somehow inhibiting the jury's ability to find mitigation from evidence of defendant's state of mind that might have been presented by the prosecution rather than the defense. He further asserts that such mitigation (in the form of probable mental illness) can be inferred from prosecution evidence of the vicious and unrelenting nature of appellant's attacks on his victims.

Although appellant is correct in his assertion that the expanded section 190.3, factor (k) instruction refers to "any sympathetic or other aspect of the defendant's character or record which may have been offered by the defendant as a basis for a sentence less than death," the court's answer does not restrict the jury's consideration of mitigation to evidence presented by the defense. On its face, the response speaks, without restriction, of all "the evidence." Moreover, the expanded section 190.3, factor (k) instruction does not restrict consideration of mitigating factors to those factors revealed by appellant's trial presentation. Indeed, it admonishes in part: "In determining which penalty is to be imposed on defendant, you shall consider *all the evidence which has been received during any part of the trial of this case.*" (Italics added.) In sum, appellant points to nothing in the instructions or any other part of the record that prevented the jury from drawing the inference of mental illness he asserts was available.

■ Appellant also maintains that, by admonishing the jury not to speculate and declining to elaborate on previous instructions, the court: (1) "implied there was no mitigating mental state . . . that would not depend upon speculation"; and (2) effectively informed jurors "they were not to find any mitigation not enumerated in the instructions." We perceive no such implications in the court's remarks. CALJIC former No. 8.84.1, as given by the court, set forth correctly and in detail the mitigating and aggravating factors and specifically directed jurors to consider "*any other circumstance* which extenuates the gravity of the crime, even though it is not a legal excuse for the crime; and any sympathetic or other aspect of the defendant's character or record which may have been offered by the defendant as a basis for a sentence less than death, whether or not related to the offense for which he's on trial." (Italics added.) There was no "reasonable likelihood" the jury misunderstood the nature or scope of the factors to be considered in its penalty decision. (*Boyde* v. *California* (1990) 494 U.S. 370, 380-381 [108 L.Ed.2d 316, 328-329, 110 S.Ct. 1190].)

■ Appellant next argues, without any supporting authority, that the court was required to include in its response to the jury's question an admonition that each juror was required to reach an individual decision. As noted in part II above, the court correctly charged the jury in this respect. It was not required to repeat that portion of the charge in response to the jury's question.

■ Finally, appellant challenges the following instruction: "Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case and that you'll reach a verdict regardless of what the consequences of such verdict may be." Although we have disapproved the use of such a "regardless-of-the-consequences" instruction, we did so in a context in which the jury was also told to ignore sympathy as a factor in its penalty determination. (*People v. Brown* (1985) 40 Cal.3d 512, 537, fn. 7 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California v. Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) Where no antisympathy instruction was given and jurors were told they could consider "pity," we found no error in a "regardless-of-the-consequences" instruction. (*People v. Howard* (1988) 44 Cal.3d 375, 443 [243 Cal.Rptr. 842, 749 P.2d 279].)

The instructions given in this case were closer to those in *Howard* (*supra*, 44 Cal.3d 375) than those in *Brown* (*supra*, 40 Cal.3d 512). The jury here was instructed to consider sympathy and any other factor it deemed appropriate under the circumstances. In light of the instructions as a whole and the arguments of counsel, we perceive no "reasonable likelihood" the jury was misled as to the seriousness of its penalty decision or the relevant factors it could consider. (*People v. Clair* (1992) 2 Cal.4th 629, 688 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

Appellant argues that the combination of alleged errors in penalty phase jury instructions deprived him of a fair trial. Finding no error in those instructions, we reject appellant's argument. The jury was correctly and completely instructed on the law applicable to capital penalty phase decisions. Appellant is not entitled to a new penalty phase trial.

### IV. Defense Counsel's Penalty Phase Argument

■ Appellant contends his trial attorney was ineffective in arguing to the jury as follows: "If you vote for the death penalty, particularly with the new Supreme Court that we have, he'll probably get it." He asserts his attorney's remark violated the rule of *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]. In *Caldwell, the prosecutor* advanced

an argument suggesting *the opposite*, i.e., that the ultimate life-or-death decision rested with the appellate courts rather than the jury. The United States Supreme Court held the prosecutor's argument unfairly minimized "the jury's sense of the importance of its role" in capital sentencing. (*Id.* at p. 325 [86 L.Ed.2d at p. 237].)

Defense counsel's argument did not diminish the jury's sense of responsibility for its decision. To the contrary, it heightened that sense by emphasizing the death penalty would probably be carried out if the jury decided to impose it. In this regard, it added a realistic dimension to the court's instruction: "It is now *your duty* to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant." (Italics added.)

Counsel's statements regarding what the appellate courts might or might not do, whether emanating from the prosecution or from the defense, are necessarily founded on speculation and are irrelevant to the penalty determination process. (Cf. *People* v. *Morris, supra,* 53 Cal.3d 152, 181-183.) Once the jury is told a sentence of "death" or "life in prison without possibility of parole" means just that, such arguments are also unnecessary. Without approving defense counsel's argument in this case, we simply observe appellant was not prejudiced in this instance by his own attorney's argument; indeed, it served to aid his cause by emphasizing the realistic, life-and-death dimension to the jury's verdict.

## V. Effective Assistance of Counsel

Appellant argues he was denied effective assistance of trial counsel at both the guilt and penalty phases. He faults the performance of his attorney in several respects. After a brief review of the applicable law, we will discuss each of appellant's contentions.

■ "To establish entitlement to relief for ineffectiveness of counsel defendant must show (1) trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People* v. *Duncan* (1991) 53 Cal.3d 955, 966 [281 Cal.Rptr. 273, 810 P.2d 131], citing *People* v. *Lewis* (1990) 50 Cal.3d 262, 288 [266 Cal.Rptr. 834, 786 P.2d 892]; see also *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].)

■ "Under *Strickland* v. *Washington,* our review of counsel's performance is to be highly deferential. As the court there noted: 'It is all too

tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation.]' " (*People* v. *Duncan, supra,* 53 Cal.3d at p. 966, quoting *Strickland* v. *Washington, supra,* 466 U.S. at pp. 689-690 [80 L.Ed.2d at pp. 694-695].) With these principles in mind, we review appellant's contentions.

 Appellant maintains his attorney did not effectively represent him with respect to his guilty plea and special circumstance admissions; he asserts counsel did not explain appellant's rights, and counsel had no reasonable tactical basis for advising appellant to plead guilty and admit the special circumstance allegations. As discussed in part I above, the record does not support appellant's assertion regarding his rights; to the contrary, it shows appellant had a full and fair opportunity to consult with his lawyer and that, as a result of the consultation and proceedings in open court, appellant fully understood and voluntarily waived each of his rights. Appellant cites nothing in the record in support of his assertion.

The record also reveals a tactical basis for appellant's guilty plea and any supporting advice given by counsel in that regard. In view of eyewitness identifications by Kimi Hansel and Steve Putnam, and the corroborating evidence, counsel could reasonably have viewed the guilt phase evidence as overwhelming. Within the bounds of reasonable tactical decisionmaking, he could also have perceived a guilty plea as a demonstration of appellant's honesty and candor that would elicit jury sympathy or, at a minimum, avoid an irremediable adverse jury reaction to an unfounded denial of the crimes. The beginning of counsel's argument to the jury is evidence of such a strategy. As counsel stated: "He [appellant] hasn't made any excuses whatsoever. No denials. And, in fact, anytime anybody pleads guilty, it has to be the idea of the person who is pleading guilty. . . . So I think right off the

bat you need to put this in context by saying to yourself that he hasn't made any excuses. . . ." Appellant has failed to demonstrate ineffective assistance of counsel with respect to the guilty plea or appellant's admission of the special circumstance allegations.

██ Appellant next argues his counsel was deficient in failing to introduce evidence in mitigation at the penalty phase. He maintains counsel should have introduced certain evidence to corroborate the testimony of appellant's sister, e.g., school records, evidence of appellant's placement in a home, a death certificate of his father, corroboration of early substance abuse, expert psychiatric or psychological testimony showing mental illness or retardation, and other items. The record contains no reference to any such evidence; without engaging in speculation, we cannot infer anything about its existence, availability, or probative force, or the probable consequences of its use at trial. Appellant has thus failed to support his claim of ineffective assistance in this regard as well. (*People* v. *Szeto* (1981) 29 Cal.3d 20, 35 [171 Cal.Rptr. 652, 623 P.2d 213]; *People* v. *Pope* (1979) 23 Cal.3d 412, 426, fn. 16 [590 P.2d 859].)

██ Pointing to his previous contentions regarding alleged prosecutorial misconduct in argument, appellant asserts his counsel was ineffective in failing to object to the prosecutor's comments. As we have held, the prosecutor committed no misconduct and the few slight factual variations between the prosecutor's opening statement and the evidence presented were not prejudicial to appellant. (See pt. II.) Defense counsel was not ineffective in failing to object when the prosecutor's conduct afforded little, if any, basis for objection.

Again incorporating prior arguments, appellant maintains counsel was ineffective because he failed to: (1) emphasize to the jurors their individual, as opposed to collective, responsibility in determining the penalty; (2) object to the "regardless-of-the-consequences" instruction; (3) propose instructions helpful to appellant on mitigation; (4) object to allegedly inadmissible evidence such as the theft and burglary from the Alton residence; and (5) suggest a proper answer to the jury's middeliberation question regarding the development of mitigating evidence through inference. Appellant offers no legal argument or reference to the record on these points not previously advanced by him in connection with the contentions reviewed in parts I through IV above. For the reasons stated in our discussion there, we find no support for appellant's assertion that he was denied the effective assistance of counsel at any stage of these proceedings.

## Disposition

The judgment of death is affirmed in its entirety.

Mosk, J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied January 13, 1993.