Filed 9/30/15  P. v. Armendariz CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MATHEW MICHAEL ARMENDARIZ,<br><br>    Defendant and Appellant. | B252498<br><br>(Los Angeles County<br>Super. Ct. No. PA068869) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel B. Feldstern, Judge.  Affirmed.

Joy A. Maulitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Timothy M. Weiner and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Mathew Michael Armendariz appeals from the judgment entered following his conviction by jury on count 1 – attempted willful, deliberate, and premeditated murder, count 2 – first degree burglary with a person present, and count 3 – criminal threats. (Pen. Code, §§ 664, 187, 459, 667.5, subd. (c)(21), 422.) The court sentenced appellant to prison for an unstayed term of life plus three years. We affirm.

## FACTUAL SUMMARY

1. *People's Evidence.*

Evidence at trial established the following. Appellant, his wife Stacey Armendariz (Stacey), and their children lived near Lancaster. In May 2008, appellant began acting strangely and was asked to leave the church his family attended. Appellant told Stacey he had been having evil thoughts and dreams. He said he had dreamed about killing himself, her, and people in church. In about late June 2008, the family went to Oklahoma, planning to move there but taking only some of their belongings. The family put items in storage, including most of appellant's guns.

On July 3, 2008, the family drove back to California to get their remaining belongings. During the drive, appellant cried. He took a pocket knife out of his pocket and gave it to Stacey. Appellant said he had been having evil thoughts "like plunging this knife into [Stacey's] chest."

During the evening of July 4, 2008, the family drove home and appellant asked Stacey if she knew why he had not yet killed all of them. Appellant said he did not have the "guts" to pull the trigger but he wanted to send the family to heaven. Stacey was afraid for herself and the children. Appellant said, "[y]ou guys aren't going to Oklahoma. You guys don't get it. None of us are going to Oklahoma." Matthew, appellant's son, understood appellant was saying he intended to kill the family. Stacey took two guns from inside the residence and hid them.

Between 1:00 a.m. and 2:00 a.m. on July 5, 2008, appellant awakened Stacey and asked where she had put the guns. Stacey indicated she had thrown them away. Appellant threw himself on the bed and said he was going to kill himself. Later that morning, Stacey prepared to go to church, planning to take the children and not return.

2

Appellant took her cell phone and keys, and said she was not going to church. However, appellant later returned the cell phone and told the family to leave. Stacey and the children stayed at a friend's cabin.

About 1:30 a.m. on July 8, 2008, appellant left a voicemail message on the cell phone of Ford Congleton, Stacey's father. The message said appellant had killed Stacey and the children. Congleton's wife contacted the sheriff's department. About 5:30 a.m., uniformed Los Angeles County Sheriff's Deputy James D'Antonio and his partner went to appellant's residence after receiving a call about the voicemail. A sergeant and another unit also arrived. D'Antonio tried to contact appellant by calling his telephone number and using a loudspeaker to tell him to exit his residence. Deputies drew their guns and searched appellant's home and cars. While deputies were searching for appellant, Charlene Thompson, who lived next door, was in her front yard. About five minutes later she walked towards her front door and saw appellant exit it. Thompson testified appellant had a "zombie . . . look in his eyes."

Thompson, who had not given appellant permission to enter her home, asked him how he had entered. Appellant replied he had come over earlier. Thompson entered her home, locked the door, and called the sheriff. While Thompson was on the phone, she saw appellant walk across the back of her property and begin climbing a fence that separated her property from the Armendariz property. Deputies including D'Antonio met appellant there. Deputies, pointing guns at appellant, conducted a patdown search of him and recovered a pocket knife. After D'Antonio's partner seized the knife, D'Antonio conversed with appellant. The prosecutor asked D'Antonio were any guns drawn at that point, and D'Antonio replied no. Appellant was not in handcuffs or under arrest.

While D'Antonio and appellant were standing near the fence, D'Antonio asked appellant about the voicemail. Appellant acknowledged making the call and said "it was for pure evil." D'Antonio asked appellant where he had been. D'Antonio testified appellant replied "[appellant] was at the neighbor's house and that [appellant] . . . took their garage door remote control out of a vehicle, entered their house, and intended on

3

harming or killing them [the Thompsons]."[1] Appellant told D'Antonio that appellant intended on harming or killing them, and appellant vaguely said he wanted to do so for "biblical reasons." Appellant said he wanted to kill his wife and children for religious reasons; appellant felt God had failed him and appellant wanted revenge. Appellant said God had failed him and appellant's violent acts would be revenge against God. Appellant did not say he wanted to kill himself.

D'Antonio transported appellant to the psychiatric ward of Olive View Medical Center (Olive) for a 72-hour hold for psychological evaluation. Peter Thompson (Peter), Thompson's husband, came home, searched outside his house, and found outside his garage door various items not belonging to the Thompsons, i.e., a pickax, meat cleaver, and LED headlamp.

On July 14, 2008, appellant's mother called Los Angeles County Sheriff's Deputy Juan Carrillo and told him appellant was scheduled to be released from the Henry Mayo Hospital (Mayo).[2] Carrillo went to the hospital. Appellant had not been arrested and no charges had been filed. Appellant was being treated at the hospital for a mental condition.

Carrillo testified at the preliminary hearing as follows. Appellant's mother had called Carrillo and had told him appellant was being evaluated by a doctor and was being discharged from the hospital. Carrillo went to the hospital and spoke with appellant in a

---

[1]    At appellant's preliminary hearing, D'Antonio's direct examination testimony was similar to the above and he testified appellant hid in a closet near the kitchen. D'Antonio also testified he asked appellant why he did that, and "[appellant] said, '. . . I was going to hurt him,' for, . . . biblical reasons." During cross-examination at the preliminary hearing, D'Antonio testified appellant's exact words included, "[appellant] wanted to hurt them or harm them."

[2]    During July 21, 2011 pretrial proceedings, the trial court indicated appellant had been placed on a 72-hour hold pursuant to Welfare and Institutions Code section 5150, "and even longer, . . . in conjunction with the events that underlie the charges in this case. And he did spend time under those circumstances in a hospital being evaluated, . . ."

4

room in the behaviorial unit. Carrillo testified the room was "like a [sally port]."**3** Appellant was escorted to the interview location. A detective and a social worker were with Carrillo. The hospital had told Carrillo it could not keep appellant. Appellant wanted to leave. When Carrillo was finished speaking with appellant, appellant asked, and was permitted, to leave. About an hour after Carrillo talked with appellant, two other deputies arrested appellant.

Carrillo testified at trial that, during the interview, appellant said as follows. Appellant was hiding in the bushes when he saw Peter leave the residence. Appellant originally was waiting outside in the bushes, but decided to enter the house to wait for Peter. Appellant entered the Thompson residence through its garage by using a garage door opener appellant had taken from the Thompsons' vehicle. Appellant entered the house and was in the kitchen closet, "waiting for Pete." Appellant entered the house because "he wanted to kill his neighbor Pete Thompson." Carrillo testified appellant did not say he went to the Thompsons' house so he could surprise them and they would kill him. Appellant did not say he went there so police would come and kill him. Later during the day of the interview, Carrillo asked deputies to arrest appellant.

About July 16, 2008, Carrillo, at the request of a social worker, returned to Mayo and observed graffiti appellant had written on a wall of the room in which he had been housed. Appellant had written, in red, profanity and messages reflecting hatred towards God, Stacey, and others.

2. *Defense Evidence*.

In defense, Gordon Plotkin, a clinical psychiatrist who conducted forensic evaluations, testified as follows. Plotkin conducted a forensic evaluation of appellant. Appellant suffered from schizophrenia at the time of the 2008 incident. He suffered from religious delusions. Appellant believed God needed to punish him because he was evil

---

**3** A sally port is "a gate or passage in a fortified place for use by troops making a sortie." (Merriam-Webster's Collegiate Dict. (10th ed. 1995) p. 1032.)

5

and the only way appellant could save his family from following his path was to kill them so they would go to heaven.

Plotkin interviewed appellant prior to trial. During the interviews, appellant did not say he wanted to harm or kill his neighbors. Appellant said the following. When the family was driving to Oklahoma, he thought about hurting himself and his family. Appellant wanted to kill his wife and children for biblical purposes. Appellant was afraid he would do something to his family. He went to the neighbors' house and left his weapons outside. Appellant intended to make a show of force so Peter would kill him.

## ISSUES

Appellant claims he was denied effective assistance of counsel and the trial court erroneously denied his motion for a new trial.

## DISCUSSION

*Appellant Was Not Denied Effective Assistance of Counsel and the Trial Court Properly Denied His Motion for a New Trial.*

1. *Pertinent Facts.*

On April 27, 2010 (in case No. PA061523), appellant, represented by counsel, filed motions to suppress his July 8, 2008 statements to D'Antonio and appellant's July 14, 2008 statements to Carrillo. Appellant made each motion on the ground the respective statements were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*). On November 23, 2010, a new information (in case No. PA068869, the present case) was filed. Appellant was represented by new counsel, i.e., Attorney Jeffrey Morris and appellant entered pleas of not guilty, and not guilty by reason of insanity. Morris did not refile the suppression motions.[4] Morris represented appellant at his 2012 trial.

_____

[4] During August 17, 2011 pretrial proceedings, appellant waived his right against self-incrimination with respect to compelled statements he made to court-appointed experts, including Plotkin, during previous proceedings to determine appellant's competency to stand trial. The court understood appellant waived his right against self-incrimination so appellant could introduce the statements at the guilt phase of trial on the

On March 11, 2013, appellant, represented by new counsel, made a motion for a new trial, in part on the ground Morris provided ineffective assistance of counsel by failing to file suppression motions. During an August 8, 2013 hearing on the motion for a new trial, Morris testified his failure to move to suppress statements appellant made to the deputies was part of a strategy. He testified to the effect suppression motions would have been of little benefit to appellant's defense.

On September 19, 2013, after argument on the motion for a new trial, the court indicated as follows. Morris's dilemma had been that, because appellant had no prior history of mental illness, it would have been difficult to convince a jury he had experienced a "psychiatric break from reality." However, appellant had undergone extensive pretrial psychological evaluations in connection with competency proceedings.

The court also indicated as follows. Morris had believed there was powerful circumstantial evidence of premeditated intent to kill.[5] Morris reasonably believed he should attack the evidence of appellant's criminal mental state. Appellant told a host of competency evaluators the same things he told the deputies. Morris had indicated he had wanted to present the most compelling psychiatric testimony at trial. Morris had expected that appellant's medical history, including statements he had made to treating doctors, medical staff, and/or deputies, would be presented at trial. Morris had explained that, in light of the totality of the above, he did not move to suppress statements which had been made to "a whole range of people, not just simply law enforcement."

The court also indicated as follows. It was not reasonably likely the court would have suppressed D'Antonio's testimony. Morris believed the evidence of the People and

issue of his mental state. Appellant's jury trial commenced in June 2012 and the jury convicted him in July 2012.

[5] The court stated the circumstantial evidence included the facts appellant was personally armed with a knife while inside the Thompson residence; appellant brought the knife to the house and hid inside while Thompson was at home; appellant brought to the location a pickax, meat cleaver, and two flashlights; and one was a head-mounted flashlight. The court observed that, after trial, a juror told Morris that appellant could have brought a pickax to "bury the body."

7

the defense could be used to negate intent and premeditation, and to support an insanity defense. This was a sound defense strategy with which appellant personally had agreed after a full discussion of the matter; the fact the strategy ultimately was unsuccessful did not affect the analysis. Appellant had elected not to testify but was able to present his statements through Plotkin. The court denied appellant's motion for a new trial. We will present additional facts below where pertinent.

2. *Analysis.*

 a. *No Ineffective Assistance Occurred Regarding Suppression Motions.*

Appellant argues he was denied effective assistance of counsel by Morris's failure to suppress his statements to D'Antonio and Carrillo on the grounds the statements were obtained in violation of *Miranda*, and the trial court erroneously denied appellant's motion for a new trial.[6] We disagree for three reasons.

 (1) *Morris Reasonably Could Have Concluded a Motion to Suppress Appellant's Statements to D'Antonio Would Have Been Futile.*

First, a defense counsel's failure to make a futile motion is not constitutionally-deficient representation. (*People v. Solomon* (2010) 49 Cal.4th 792, 843, fn. 24) and, for the reasons discussed below, Morris reasonably could have concluded a motion to suppress appellant's statements to D'Antonio would have been futile (cf. *People v. Price* (1991) 1 Cal.4th 324, 386-387).

---

[6] We resolve appellant's ineffective assistance claim under familiar principles. " 'A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components.' [Citations.] 'First, the defendant must show that counsel's performance was deficient.' [Citations.] Specifically, he must establish that 'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.]" (*People v. Ledesma* (1987) 43 Cal.3d 171, 216 (*Ledesma*).) A reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance; that is, appellant must overcome the presumption that, under the circumstances, the challenged action *might* be considered sound trial strategy. (*People v. Wrest* (1992) 3 Cal.4th 1088, 1115.) "In addition to showing that counsel's performance was deficient, a criminal defendant must also establish prejudice before he can obtain relief on an ineffective-assistance claim." (*Ledesma*, *supra,* 43 Cal.3d at p. 217.)

The premise of appellant's argument that his statements to D'Antonio should have been suppressed is appellant was in "custody" for purposes of *Miranda* when D'Antonio spoke with him.[7] We reject the premise. There was substantial evidence in the present case as follows. D'Antonio arrived at the scene, deputies searched appellant's home and cars, and deputies used a loudspeaker to ask him to exit his house. However, there was no evidence appellant, who had been hiding in the Thompson house, was aware of these facts.

Prior to questioning appellant, D'Antonio knew about appellant's voicemail. However, whether or not D'Antonio had, or believed he had, probable cause to arrest appellant before questioning him, there is no evidence D'Antonio ever told appellant that D'Antonio had probable cause to arrest. Any knowledge, beliefs, or intents of D'Antonio that he did not communicate to appellant are irrelevant to the custody analysis. (Cf. *Stansbury*, *supra,* 9 Cal.4th at pp. 827-828, 830; *Lopez, supra,* 163 Cal.App.3d at p. 606.)

---

[7] We resolve the issue under familiar principles. "Disregarding the *uncommunicated* subjective impressions of the police regarding defendant's custodial status as irrelevant, we consider the record to determine whether defendant was in custody, that is, whether examining all the circumstances regarding the interrogation, there was a ' "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citation.] As the United States Supreme Court has instructed, 'the only relevant inquiry is how a reasonable man in the *suspect's* shoes would have understood his situation.' [Citation.]" (*People v. Stansbury* (1995) 9 Cal.4th 824, 830 (*Stansbury*), italics added.) Moreover, in *People v. Clair* (1992) 2 Cal.4th 629 (*Clair*), our Supreme Court stated, "The *Miranda* court itself declared that '*General on-the-scene questioning as to facts surrounding a crime . . . is not affected by our holding.*' [Citation.] . . . [¶] . . . [¶] . . . *Generally, . . . [the term "custody"] does not include a temporary detention for investigation.* (See *Berkemer v. McCarty* [(1984)] 468 U.S. [420,] 439-440 [82 L.Ed.2d [317], 334].) Such a detention, as noted, allows 'the officer . . . [to] ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.' (*Id.* at p. 439.)" (*Clair*, *supra,* 2 Cal.4th at p. 679, italics added.) "Case law has identified a number of objective indicia of custody for *Miranda* purposes, such as (1) whether the suspect has been formally arrested, [fn. omitted] (2) absent formal arrest, the length of the detention, [fn. omitted] (3) the location, (4) the ratio of officers to suspects, [and] (5) the demeanor of the officer, including the nature of the questioning." (*People v. Lopez* (1985) 163 Cal.App.3d 602, 608 (*Lopez*).)

The fact D'Antonio and deputies approached appellant with their guns drawn did not convert the detention into custody. (*Clair*, *supra,* 2 Cal.4th at p. 679.) Appellant was not in handcuffs. The patdown search of appellant (incident to a *detention* (see *People v. Celis* (2004) 33 Cal.4th 667, 678)) occurred outside. D'Antonio testified at appellant's preliminary hearing that the entire encounter was in the front yard. There is no dispute the patdown search was lawful.

After the patdown search and recovery of the knife from appellant, deputies holstered their guns. *Miranda* warnings need not be given merely because police initially use weapons to effect an investigative stop. (*People v. Taylor* (1986) 178 Cal.App.3d 217, 230.) There is no evidence appellant was ever told at the scene that he was under arrest. And, in fact, he was not arrested at the scene. Any interrogation of appellant by D'Antonio was brief; D'Antonio testified the entire encounter with appellant while he was making statements was 15 minutes. Appellant cites no evidence the content or manner of the questioning was coercive. The trial court stated it was not reasonably likely the court would have suppressed D'Antonio's testimony. Morris did not provide constitutionally-deficient representation by failing to move to suppress appellant's statements to D'Antonio, because the record demonstrates appellant was not in "custody" for purposes of *Miranda* when D'Antonio spoke with him.

Finally, in light of our discussion below, there is no need to reach the issue of whether appellant was in "custody" for purposes of *Miranda* when Carrillo spoke with him at the hospital, or whether Morris reasonably could have concluded a motion to suppress appellant's statements to Carrillo would have been futile.

(2) *Morris Reasonably Decided to Refrain from Making Suppression Motions as a Matter of Sound Strategy.*

Second, as indicated by Morris and the trial court's comments during the motion for a new trial, Morris's failure to file suppression motions was part of his strategy. Instead of filing suppression motions, Morris wanted to introduce at the guilt phase of trial the extensive psychiatric information and evidence produced during appellant's competency proceedings, including appellant's statements to the deputies and similar

10

statements he made to others. That evidence also included appellant's statements to Plotkin when he was a court-appointed expert evaluating appellant's competency. Morris wanted the guilt phase jury to consider that evidence with the guilt phase evidence, presented by the People and appellant, of appellant's statements to the deputies. Morris also wanted the guilt phase jury to consider that competency evidence with Plotkin's guilt phase testimony as a defense expert. Morris had hoped the jury would view leniently the incriminating and exculpating statements of appellant as proof he lacked intent to kill.

Morris reasonably could have concluded the comprehensive use of appellant's incriminating and exculpating statements to mount a mental state defense was sound defense strategy. However, Morris also reasonably could have concluded the resulting extensive exposure of the guilt phase jury to appellant's incriminating and exculpating statements would, as a practical matter, diminish any benefits of suppression motions. Morris did not provide constitutionally-deficient representation by failing to move to suppress appellant's statements to D'Antonio and Carrillo.

(3) *Any Constitutionally-Deficient Representation Was Not Prejudicial.*

Third, even if Morris provided constitutionally-deficient representation by failing to seek suppression of appellant's statements to D'Antonio and Carrillo, it does not follow we must reverse the judgment. Appellant maintains Morris should have sought suppression of (1) appellant's statement to D'Antonio that appellant "intended on harming or killing them [i.e., the Thompsons]" and (2) appellant's statement to Carrillo that appellant "wanted to kill his neighbor Pete Thompson." However, as pertinent here, the above statements were evidence of appellant's intent to kill Peter. The jury, having convicted appellant of the attempted willful, deliberate, and premeditated murder of Peter, necessarily concluded beyond a reasonable doubt not only that appellant harbored an intent to kill Peter, but that appellant's intent to kill Peter was deliberate and premeditated. Even if Morris's failure to seek suppression of the above mentioned statements was constitutionally-deficient representation, it was not prejudicial. (See *Ledesma*, *supra,* 43 Cal.3d at p. 217.)

11

b. *No Ineffective Assistance of Counsel Occurred Regarding Impeachment.*

Appellant argues he was denied effective assistance of counsel by Morris's failure to impeach D'Antonio's trial testimony that appellant said he "intended on harming or *killing* them [i.e., the Thompsons]." (Italics added.) Appellant maintains Morris should have impeached that testimony with D'Antonio's preliminary hearing testimony that (1) appellant said he was going to "hurt" Peter and/or (2) appellant said he wanted to "hurt them [the Thompsons] or harm them." We reject the argument for three reasons.

First, the record sheds no light on why appellant's trial counsel failed to act in the manner challenged, the record does not reflect said counsel was asked for an explanation and failed to provide one, and we cannot say there simply could have been no satisfactory explanation. (Cf. *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268.) Second, in light of the evidence of appellant's intent to kill Peter (including that set forth in fn. 5, *ante*) Morris reasonably could have concluded as a matter of strategy that the proposed impeachment ultimately would have been of marginal value.

Third, even if Morris had impeached D'Antonio as proposed, that impeachment simply would have provided evidence appellant lacked intent to kill. However, the jury, by its verdict, necessarily concluded beyond a reasonable doubt that appellant not only harbored intent to kill but an intent to kill that was deliberate and premeditated. Morris's failure to impeach D'Antonio as proposed was not prejudicial. Appellant was not denied effective assistance of counsel and the trial court did not erroneously deny his motion for a new trial.

## *DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

EDMON, P. J.

ALDRICH, J.