Filed 5/6/15  P. v. Esswein CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>MARSHA KAY ESSWEIN,<br><br>    Defendant and Respondent. | G050900<br><br>(Super. Ct. No. INF062819)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside, Gary B. Tranbarger, Judge.  Reversed with directions.

Paul E. Zellerbach, District Attorney and Matt Reilly, Deputy District Attorney, for Plaintiff and Appellant.

Robert Franklin Howell, under appointment by the Court of Appeal, for Defendant and Respondent.

\*        \*        \*

This is an appeal by the People from an order granting a partial new trial after a jury found defendant Marsha Kay Esswein guilty of first degree murder.  (Pen. Code, § 187.)  The court partially granted defendant's motion for a new trial on the basis of prosecutorial misconduct.  The court found the prosecutor committed misconduct by setting forth a theory of premeditation in the opening statement that ultimately had no evidentiary basis at all.  The court found the misconduct was prejudicial on the issue of whether defendant's act of killing the victim was premeditated, though the court found it was not prejudicial as to whether defendant committed second degree murder, nor was it prejudicial on the issue of defendant's sanity.  Accordingly, the court granted a partial new trial solely on the issue of premeditation.

The People contend the court abused its discretion in finding the prosecutor committed misconduct.  We disagree and affirm on that issue.

Assuming there was misconduct, both parties agree the court erred by ordering a new trial on a single element of a crime.  They disagree as to what results from that error.  The People contend we should reverse the order and reinstate the jury verdict. Defendant argues we should reverse the order with instructions to grant a complete new trial.  Because the court properly found the prosecutor had committed prejudicial misconduct, we reverse with instructions to grant a complete new trial.

FACTS

In August 2008, Defendant resided with her husband Richard Esswein in Rancho Mirage, California.  Richard was 83 years old at the time.  Defendant was 62 years old.  They had been married for approximately 24 years.  They had approximately $2 million in assets.

Carol Winkler was the Essweins' next-door neighbor and a friend of both Defendant and Richard.  On August 7, 2008, Winkler met Richard while they were both

2

walking their dogs. Winkler asked Richard for a ride the next morning to pick up her vehicle. That afternoon she called the Essweins' residence to confirm the plan. Defendant answered and said, without consulting Richard, that it would be no problem for Richard to pick her up the next morning at approximately 8:00 a.m. Winkler asked defendant to confirm with Richard to be sure. Defendant put the phone down and came back a minute later again stating that Richard would pick Winkler up the next morning.

The next morning, having not heard from Richard at the appointed time, Winkler called the Essweins' residence multiple times. There was no answer, so Winkler walked next door to their house. She found a manila envelope on the porch and the door slightly ajar. The envelope had her name on it. Winkler knocked and then entered the home, yelling defendant's and Richard's names. She made her way to defendant's bedroom where she found defendant "on the floor in a fetal position shaking like a leaf with her eyes closed." Next she went to Richard's bedroom to alert him, but found him on the floor, covered with a blanket.[1] She ran home and called 911.

The police arrived at the scene and found Richard on the floor, dead, with a comforter over him and three religious necklaces on top of the comforter. There was a lot of blood on Richard's face and on the carpet below his head. Once the comforter was pulled back, the police found four large visible stab wounds to Richard's abdomen area, as well as many stab wounds to his upper chest, neck, and face area. They also found injuries to Richard's hands and arms. Richard was wearing only underwear type boxer shorts. The police also found blood in the middle of Richard's bed, enough to soak through the sheet and stain the mattress.

A wood knife block in the kitchen was missing two knives. The two knives, one with an 8-inch blade, the other with a four and one-half inch blade, were found in defendant's bedroom. Blood on one of the knives was tested for DNA and came

---

[1] Defendant and Richard had separate bedrooms.

back with only defendant's DNA. Also in the kitchen the police found a woman's shirt and a hand towel, both bloody, and both in the trash can. Subsequent DNA testing revealed that the blood on the shirt was Richard's.

The police found the manila envelope Winkler had initially found. The note on the front said, "Carol please help us [+] the dogs." Inside they found a document with a Post-it note attached that said, "This will help him get buried" "please." The word please was underlined. The envelope also contained contact information for various people, insurance paperwork, financial documents, mortuary documents, a note asking Carol to send the materials to Richard's son, and a note, apparently to Richard's son, stating, "You do not need to be the executor to bury your father. They only use the paperwork I sent you."

Defendant was taken to a local hospital. The first officers to approach her testified she was groggy and mumbling. She told one officer that Richard was at home sleeping and attributed various cuts on her wrists to Richard.

Beginning later that day and over the course of the next day, detectives interviewed defendant. The interviews were recorded, transcribed, and played for the jury. Her statements were as follows:

Initially defendant stated she did not remember what happened the night before. She recalled speaking with a friend on the phone and going to bed after dinner. She did not remember how she got injured. She explained that she suffered from agoraphobia, meaning, as she explained it, she's afraid to go outside and stays inside, depressed, all day. She explained that her psychological problems were associated with a lawsuit that she feared was coming. She prepared taxes for a living and believed she had botched a client's taxes and that the client would be suing her.

Approximately two and one-half hours later, the detectives again interviewed defendant. This time, she remembered receiving her injuries fending off a knife attack, and that Richard had a knife, but she was hazy on the details. The interview was cut off by a doctor visit.

In a third interview that same day, she explained that she and Richard had gotten into an argument over comments defendant made about Richard's cooking. Defendant attributed cuts on her neck to Richard. She clarified that the cuts on her wrists were self-inflicted, but that the cuts on the back of her hands were defensive wounds fending off Richard's knife. During the course of this interview she still seemed confused at times, and at one point she stopped speaking, paused for 10 seconds, and asked, "Did I kill him?" The detective responded, "I don't know? Do you think you did?" Defendant responded, "I don't know? . . . I don't know? . . . I don't know? I honestly don't remember?" During the interview the detectives photographed bruises on defendant's body.

On the second day, defendant's account was significantly clearer. Her account was as follows: "Okay. We were eating dinner. He made up a roast. I said, 'Why did you make the roast so tough?' He had the knife in his hands and he said, 'You . . .' he had been drinking, he usually drank one glass of wine. And he had three or four. . . . And when Richard drinks sometimes he gets very mean. And he said, 'If you do that again, if you say anything again, I'll kill you.'" Defendant was angry, but the two went their separate ways. Later defendant went to Richard's room to try and make up with him (though she brought a knife with her), and he said, "Get out of here!" He was brandishing his knife. Defendant replied, "Don't you do that to me. Don't you talk to me. Don't you push that knife at me. How dare you!" At that point, "he came after me and I came after it and it was like (*Esswein gestures with a slapping sound*) . . . ." She later elaborated, "[T]here was a point where he came toward me but I, I said, 'Stop that! What are you doing?' And I put up both of my hands with the knife . . . ." "And he said,

5

'I'm tired of you bossing me around!' And it, suddenly just got out of control. And he went like this (*Esswein gestures*) you know like (*Esswein gestures*). [¶] [Detective:] Like just swinging in front of you? [¶] [Defendant:] Yes. [¶] [Detective:] Then what happens? [¶] [Defendant:] I swung in front of him. And then I'm really mad . . . [a]nd that's when he came down and we both fell on the floor." Defendant landed on top of Richard and stabbed him multiple times. Defendant eventually tired and stood up. Richard tried to chase her once, but she pushed him down. "[T]his time he was not in good shape, with all the liquor." Richard told her to get out, so she did. After she left the room is when Winkler called.

Later that evening defendant went back into Richard's room to put a blanket on him because it was cold. He was alive and breathing as though he was asleep. There was a lot of blood around him so defendant asked Richard whether she should call the paramedics, but he told her not to. That is when she put the religious necklaces on him.

Defendant explained that she put the envelope together for Winkler with the various documents in them because Winkler had an office near Richard's son and she thought Winkler could send the documents. She stated that she still thought Richard would be fine at that point.

The detectives also questioned defendant about prescription medication that was scattered around defendant's bathroom and she stated that she tried to kill herself by overdosing because of the lawsuit that she anticipated (and not because of what happened to Richard). She also explained that the cuts on her wrist were from her attempting suicide.

Detectives interviewed her twice more that day. Defendant's account remained essentially consistent. At one point she stated, "What kind of charges will you be filing? [¶] [Detective:] It's going to be homicide. Murder. And the D.A.'s office will make the final decision. [¶] [Defendant:] Do I need to go through a trial can't I just

6

say I admit it? [¶] [Detective:] That is for you to discuss with the D.A.'s office. Once again that goes into that aspect where I cannot advise you of any legal matters. [¶] [Defendant:] I did it. Why go through all the trouble?"

An autopsy was performed on Richard's body. Richard had 25 stab wounds, multiple incise (slashing) wounds, and multiple poke wounds. He suffered 17 stab wounds to his face, left ear, and neck region; he suffered five or six wounds to his chest and abdomen. The abdominal wounds penetrated as far as four to five inches. Richard also had multiple defensive wounds.

The injuries that caused Richard's death were several stab wounds to his neck "which resulted in wounds to his jugular veins, . . . and these led to extensive bleeding and resulted in death in a matter of minutes." Loss of consciousness would have occurred in 10 minutes at the most. Death would have occurred in no more than 20 minutes. The abdominal wounds would have been fatal, but over a much longer period of time: several hours, up to one or two days.

The People presented a transcript of a jail house call between defendant and her friend Arlene Kahn. In it, Kahn mentions that she saw defendant in the news. She then says, "Did you see it? [¶] [Defendant:] Yes. [¶] Kahn: Marsha did you? [¶] [Defendant:] I was so sick. [¶] Kahn: He must've beat the hell out of you. But don't say a word. [¶] [Defendant:] No. He didn't beat it. [¶] Kahn: Don't say a word. I don't wanna hear about . . . ."

In the weeks preceding Richard's death, defendant engaged in a number of financial transactions. For example, Richard's will was amended to make her the executor. She moved all of her cash and assets into Richard's name. She liquidated stock accounts. And she and Richard were attempting to get a sham divorce. Defendant claimed these transactions were intended to hide assets from potential judgment creditors of her business. Her testimony was corroborated by Richard's friend of 40 years, Charles Shaw, who, by stipulation, testified that Richard and defendant "were worried that Mrs.

7

Esswein would be sued by past clients of her business and that those lawsuits could be millions of dollars. That Mr. Esswein told Mr. Shaw that they—Mr. and Mrs. Esswein — had decided that they would file for a divorce for the purpose of protecting assets from the lawsuit or lawsuits. And that . . . Mr. Esswein understood the plan that the assets would go to him. That Mr. Shaw would testify that Richard Esswein told him that a divorce was not for any purpose other than the protection of financial assets. That Mr. Esswein did not really want to divorce his wife, and that Mr. Esswein did not believe that Mrs. Esswein really wanted to divorce him, and that they were not truly breaking up."

The case was tried to a jury, which found defendant guilty of first degree murder, and found it to be true that the murder was committed with a deadly weapon. In a bifurcated proceeding, the jury rejected defendant's insanity defense.

Defendant moved for a new trial on the basis of prosecutorial misconduct. Defendant identified 42 different alleged instances of misconduct. Among defendant's complaints was that the prosecutor created a "false lesbian lovers running off with the money story." Defendant also complained that the prosecutor stated that the Internal Revenue Service (IRS) was coming after defendant, when, in fact, there was no evidence of that. "No one sued Marsha Esswein, and to falsely state that they did, cuts deeply into defense theory that these notions were mental illness and delusion causing bizarre behavior and fear in Mrs. Esswein . . . ."

In his opening statement, the prosecutor set forth a theory in which defendant conspired with her friend Arlene Kahn. He stated, "Phone records are checked. Yes, they show that the two talked for about three, four hours [right after defendant stabbed Richard]. And [defendant] says, yeah, after I got done talking to Carol, I went ahead and I called Arlene Kahn, and I talked to her for about three hours. [¶] Well, what was said? The police went out to talk to Arlene Kahn a day or two later. I'm not talking to you until I talk to Marsha's attorney. So we don't know what was said between the two. But what we do know is, after she got done speaking for about three,

8

three and a half hours, she hangs up the phone and she puts together a folder." "In the end [defendant] wanted to separate from her husband, who's 83. She wanted to — Arlene Kahn says straight out, 'We had plans before all this happened. You and I were going to live together with all the money. Don't you want to still go live with me?' 'Yes.'"

During trial, however, there was never any evidence presented that phone records were checked, no evidence of a three to four hour call between defendant and Kahn, no evidence that Kahn refused to talk to the police before speaking with defendant's attorney, no evidence that defendant wanted to separate from her husband, no evidence that defendant was maneuvering money into her own hands, and no evidence that defendant and Kahn had plans to run off and live together with the money.

With regard to the IRS coming after defendant, the prosecutor stated, "So it turns out the police do a little investigation. It turns out—well, she also says that the I.R.S. is going to come after her as well. [¶] Turns out, the I.R.S. did." "Well, of course she was depressed, ladies and gentlemen, because the evidence is going to show the I.R.S. was going to catch up with her, and she knew she was going to get sued."

There was never any evidence that the IRS was, in fact, coming after defendant, as opposed to defendant simply being paranoid or delusional about the possibility.

In the opposition to the new trial motion, the prosecutor submitted a declaration that offered no explanation for these omissions, stating only, "During the opening statements in each phase of the trial, I referred only to evidence that I believed would be produced during the trial."[2]

---

[2] At oral argument on appeal, the People made the claim that the court excluded much of the evidence the prosecutor mentioned in his opening statement. During the reply argument, however, the People retracted this statement and conceded that the only evidence excluded was a subpoena to defendant to testify before a grand jury in a case brought by the IRS against one of defendant's clients. The excluded

9

In ruling on the motion for a new trial, the court stated, "I find that the opening statement as a whole involves the prosecution presenting a theory of the case, a major theory of the case, for which there was no evidence." The court went on, "The People never presented a coherent theory of how a fully rational individual operating from a coldhearted, cynical evaluation of their financial condition and their desire to want to start a new life with someone else, could have possibly thought that she could have got away with this crime." The court described this as "not a minor violation of prosecutorial misconduct in opening statement. It is a massive violation because it is the entire theory of your case."

The court decided, however, that the misconduct was prejudicial only on the issue of premeditiation, not on any issue concerning second degree murder or defendant's insanity defense. Accordingly, it gave the prosecution a choice: accept a verdict of second degree murder, or have a new trial on a single issue only: whether the killing was premeditated. Since the prosecution refused a second degree murder verdict, the court ordered a new trial solely as to the issue of premeditation. The People appealed.

---

evidence would have served only to substantiate that the IRS investigated one of defendant's clients. It does not substantiate that the IRS was investigating defendant. During the oral argument below on the new trial motion, the prosecutor conceded that he had not made an offer of proof that an IRS agent would testify to an investigation of defendant.

With regard to Arlene Kahn, the prosecutor stated at oral argument below, "She was out of state, Your Honor. She moved. She evaded us." Defense counsel responded, however, that Kahn had maintained regular contact during the four years of the investigation, and counsel stated she was able to use Kahn's phone number from the file to discover Kahn's address in Little Rock, Arkansas with just two minutes of internet research.

DISCUSSION

We begin with the People's contention that the court erred by finding prosecutorial misconduct. "As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) "'"We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." [Citations.] "'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.'"'" (*People v. Lightsey* (2012) 54 Cal.4th 668, 729.)

"'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 835 (*Jablonski*).) "'Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'" (*Ibid.*) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

The People's first contention is that defendant forfeited the prosecutorial misconduct claim by failing to object during the prosecutor's opening statement. "As a prerequisite for advancing a claim of prosecutorial misconduct, the defendant is required to have objected to the alleged misconduct and requested an admonition 'unless an

11

objection would have been futile or an admonition ineffective.'" (*Jablonski, supra*, 37 Cal.4th at p. 835.) Defendant did not object during the prosecutor's opening statement.

Here, however, an objection would clearly have been futile. The claim is that the prosecution discussed extensive evidence, a whole theory of the case, that was never admitted into evidence. How could defense counsel know what evidence the prosecution would later admit? How could the trial court rule on such an objection without knowing what evidence the prosecution would ultimately produce? An objection would have been futile. There was no forfeiture.

Next, the People claim there was no misconduct because there was no indication that the prosecutor acted in bad faith. The People cite *People v. Wrest* (1992) 3 Cal.4th 1088. The alleged misconduct there was a series of comments by the prosecutor during opening statement, all of which, the court concluded, involved "either a permissible argument from the evidence or a minor deviation therefrom." (*Id.* at p. 1109.) The court further concluded, "Any inconsistency between the opening statement and the evidence was inconsequential" (*id.* at p. 1109), and "appellant suffered no conceivable prejudice (*id.* at p. 1110). In a somewhat offhanded manner, the court also stated, "Moreover, remarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted."'" (*Id.* at p. 1108.) Here, the People contend the alleged misconduct does not fall within the ambit of that latter remark.

In our view, the *Wrest* court's remark — which was offered without much analysis — did not survive the court's subsequent analysis in *People v. Hill* (1998) 17 Cal.4th 800 (*Hill*). There, the defendant alleged several instances of misconduct, many of which occurred during the prosecutor's closing argument. (*Id.* at pp. 823-827.) The People argued none were reversible error because there was no showing the prosecutor had acted in bad faith. (*Id.* at p. 823.) The court rejected this argument, noting that bad

12

faith was previously a requirement, but no longer: "In fashioning this new rule, we explained that 'this emphasis on intentionality is misplaced. "[I]njury to appellant is nonetheless an injury because it was committed inadvertently rather than intentionally."' [Citation.] Thus, 'to the extent that cases in this jurisdiction imply that misconduct must be intentional before it constitutes reversible error, they are disapproved.'" (*Id.* at p. 822.) The court went on to find misconduct where the prosecutor, during closing argument, mischaracterized the evidence and referred to facts not in evidence. (*Id.* at pp. 825-829.)

This rationale applies equally well to misconduct arising from an opening statement. The fundamental issue is whether the prosecutor's conduct rendered the trial as a whole unfair. The prosecutor's intentions, good or bad, are irrelevant to that issue.[3] It does not matter, therefore, whether the evidence the prosecutor mentions is so patently inadmissible as to imply the prosecutor intentionally mentioned inadmissible evidence. Given our high court's revised understanding of the concept of prosecutorial misconduct, the court's single remark in *Wrest* is not controlling.

In assessing whether the court was within its discretion in finding misconduct here, we first acknowledge that prosecutors cannot be expected to have a perfect roadmap of the evidence at the start of trial. Sometimes testimony shifts. Sometimes evidence is excluded. Unexpected events may give rise to a shift in the prosecutor's strategy. Given the inherently unpredictable nature of trial, most deviations between the opening statement and the evidence admitted will not constitute misconduct. And even where a deviation is sufficient to constitute misconduct, any prejudice can often be mitigated through admonitions, instructions, and closing argument.

---

[3] As our high court noted, "We observe that the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*Hill, supra,* 17 Cal.4th at p. 823, fn. 1.)

13

The present case, however, is exceptional for a few reasons. First, the prosecutor's unsubstantiated comments on the evidence represented a major part of his theory of premeditation, which focused on planning activity and motive. Second, the evidence on premeditation was close. Of the three categories of evidence of premeditation — planning activity, motive, and manner of killing[4] — evidence of planning activity and motive was virtually nonexistent. We acknowledge the prosecutor had a strong argument with regard to the manner of killing, but it was not a conclusive argument.[5] Given how close the evidence was, the insinuation that defendant had a plan and a motive could easily have tipped the scales for the jury. Finally, we have a finding by the trial court that the conduct in question was prejudicial on the issue of premeditation. In light of these factors, with due deference to the court, we affirm the court's finding that the prosecutor committed misconduct.

The People further contend that the prejudice of any prosecutorial misconduct was mitigated by the court's instructions that the statements of counsel are not evidence. There are, of course, cases extolling the effectiveness of admonitions and instructions, and cases decrying their impotence. (Compare *People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 ["We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions"] with *Hill, supra,* 17 Cal.4th at p. 845 ["""You can't unring a bell"""]; *Krulewitch v. U.S.* (1949) 336 U.S. 440, 453 (conc. opn. of Jackson, J.) ["The

_____

[4] *People v. Anderson* (1968) 70 Cal.2d 15, 26–27.

[5] The coroner could not determine the order in which the various stab wounds were inflicted. However, if the jury were to accept defendant's interview statements that she initially stabbed him and he was still alive hours later, then the neck wounds must have been inflicted in a second bout of stabbings, as those wounds would have resulted in death in a maximum of 20 minutes. The jury could, however, have rejected defendant's interview statements as either fabricated or delusional.

14

naive assumption that prejudicial effects can be overcome by instructions to the jury, [citation], all practicing lawyers know to be unmitigated fiction"].)  We need not extensively analyze the efficacy of instructions in this case, however, because our hands are virtually tied on the issue of prejudice by the court's finding that the misconduct was prejudicial:  "[T]he traditional rule is that the reviewing court will not substitute its judgment for the trial court's determination that *error was prejudicial,* and thus warrants a new trial." (*People v. Ault* (2004) 33 Cal.4th 1250, 1263.)  As we noted above, the evidence on the issue of premeditation was close, and the prosecutorial misconduct significant.  We have no reason to disturb the court's finding that the misconduct was prejudicial.

The final issue is whether the court's order for a *partial* new trial was error, and, if so, what to do about it.  The parties agree it was error.  In our own research, we have been unable to locate any authority permitting the court to order a new trial as to a single element of a charged crime.  Certainly, courts have the authority to order a retrial as to one of several charged crimes.  (*People v. Drake* (1992) 6 Cal.App.4th 92, 99.)  And it has long been permissible to hold a new trial solely on the issue of prior convictions.  (*People v. Morton* (1953) 41 Cal.2d 536, 543.)  We have found no instances, however, of a single element of a charged crime being retried.  The relevant Penal Code statute, section 1181, simply permits the court to "grant a new trial, in the following cases only:" one of which is prosecutorial misconduct. (Pen. Code, § 1181, subd. (5).)  Given the absence of authority to retry a single element of a charged crime, and the restrictive statutory language, we agree with the parties that the court had no authority to order a new trial on a single issue.

The People contend that the trial court's order is void, and thus we should reverse the court's order, reinstate the verdict, and remand for sentencing.  The People offer no explanation, however, for why we should do that given that the court properly

15

found the prosecutor committed prejudicial misconduct. In light of the court's findings, we see no other sensible disposition than to reverse with instruction to grant a new trial.

## DISPOSITION

The trial court's order granting a partial new trial is reversed. The court is directed to order a complete new trial. Because we have concluded the prosecutor, Christopher R. Ross, committed misconduct, pursuant to canon 3 (D)(2) of the Code of Judicial Ethics, we are bound to "take appropriate corrective action, which may include reporting the violation to the appropriate authority." The clerk of this court is ordered to forward a copy of this opinion to the California State Bar upon issuance of the remittitur. (Cal. Code Jud. Ethics, canon 3(D)(2).)

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

FYBEL, J.

16