Filed 6/28/23  P. v. Mendoza CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STACIE NICOLE MENDOZA,<br><br>Defendant and Appellant. | F084639<br><br>(Super. Ct. No. 18CMS1137B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Robert Shane Burns, Judge.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Kathryn L. Althizer, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant Stacie Nicole Mendoza was found guilty of first degree murder and first degree residential robbery following a bench trial. In addition, the trial court found true a special circumstance alleging that the murder was committed during the course of a robbery. Appellant was sentenced to life without the possibility of parole.

Appellant raises two claims on appeal. First, appellant argues that she did not properly and separately waive her right to a jury trial on the special circumstance allegation. Second, she contends that substantial evidence does not support the trial court's finding that she acted with the requisite intent for first degree murder. We affirm.

## PROCEDURAL HISTORY

On December 8, 2021, a first amended information charged appellant and Jose Concepcion Mendoza with one count of murder (Pen. Code,[1] § 187, subd. (a); count 1) with a robbery-murder special circumstance allegation (§190.2, subd. (a)(17)), and first degree residential robbery (§ 211; count 2). Mendoza was separately charged with voluntary manslaughter (§ 192, subd. (a); count 3). The special circumstance allegation rendered the case death penalty eligible.

Mendoza ultimately plead guilty to voluntary manslaughter in exchange for his testimony against appellant.

On September 14, 2021, the People offered not to pursue the death penalty if appellant agreed to waive her right to a jury trial and proceed with a bench trial. Appellant agreed.

On June 3, 2022, appellant was found guilty of all counts and the special circumstance was found true.

On July 6, 2022, appellant was sentenced to life without the possibility of parole for murder. The trial court stayed her sentence for robbery pursuant to section 654.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

Appellant filed a timely notice of appeal.

## STATEMENT OF FACTS

Sometime between April 3, 2018, and April 12, 2018, appellant, Mendoza, and potentially a third assailant, identified only as "Brian," brutally murdered Kenneth Coyle in his home. The murder was not discovered until a police investigation commenced on April 12, 2018. The investigation established the following:

*The Police Investigation*

On April 12, 2018, R.W., a property manager where Coyle rented a space for his mobile home, received a phone call from a woman who wanted to meet with R.W. to update her on Coyle's "situation." At around 10:15 a.m. that day, the woman, appellant, met with R.W. in R.W.'s office. Appellant told R.W. she was taking care of Coyle because he no longer felt safe in his house. She claimed that Coyle had picked up two women from a casino, and that they were going to fulfill his sexual fantasy. According to appellant, things got out of control and Coyle sustained injuries to his fingers and head.

Appellant claimed that she was friends with Coyle and he had contacted her to care for him. Appellant also stated she had not called the police, and that she had been cleaning Coyle's house for three days. Appellant said that Coyle wanted her to have his house.

R.W. said that she could assist appellant but she would need Coyle to sign some documents. Appellant got very quiet and responded that it would not be safe for R.W. to see Coyle. Appellant refused to tell R.W. where Coyle was but said that she could have "the facility" Coyle was in fax R.W. information. R.W. agreed that the authorization to transfer ownership of the mobile home could be faxed to her office.

R.W. subsequently went to Coyle's home with appellant. R.W. noticed that appellant had Coyle's house key – a distinctive key with the American flag and an eagle on it. Appellant warned R.W. that there were urine stains around the home because the

3.

cat had been left alone for several days, and the fan was on to help get rid of the smell of bleach. R.W. went into the master bedroom, where she saw many puddles of urine. On the door to the bedroom she saw a smeared bloodstain, as well as a stain right below the door. The box spring on the bed also had a bloodstain, and the mattress was gone. R.W. claimed the house smelled like blood, flesh, bleach and sanitizer. R.W. and appellant went back to R.W.'s office shortly afterward, and appellant left.

R.W. was waiting by her fax machine for appellant to send her information from Coyle's facility, when Stephen Smith, the maintenance manager, approached R.W. R.W. told Smith she had a sick feeling about the situation. Smith went to Coyle's residence. When Smith entered the house, he knew something was wrong. Everything of value was gone, and everything else in the house was either ripped apart or in a pile. Smith described the residence as ransacked and demolished. He immediately called 911.

R.W. and Smith called appellant. Appellant's story changed – she told them that she was Coyle's emergency contact and that Coyle had been found running in Stanislaus County in his underwear and he was injured. Appellant told R.W. that a detective named Sergeant Kimball could be calling her. She also told R.W. that she had taken Coyle's truck to keep it from being stolen, and her cousin had possession of it.

Several officers from the Hanford Police Department responded to Smith's 911 call. Officer Steven Sitter arrived and was directed to Coyle's residence. When inside, Officer Sitter noticed that the couch was flipped over, and what looked like bloody fingerprints were on the door to the bedroom. On the east wall of the bedroom there was a dark splatter. In the hallway there appeared to be pinkish footprints on the floor as well as bleach poured on the carpet. Officer Sitter also noted that the mattress was missing from the room. He designated the home a crime scene. A forensic investigation of the home revealed the splatters throughout the house, including those on the box spring, walls, and ceiling, were Coyle's blood. A hammer located in the hallway in a black trash

4.

bag, as well as a drawer removed from a broken nightstand in the bedroom also had Coyle's dried blood on it.

Sergeant Chad Allen became involved in the investigation and received appellant's phone number from R.W. When he called it, a woman answered the phone and said her name was Pam. The woman claimed she was a friend of Coyle's, but that she had not seen Coyle since April 6, 2018. Sergeant Allen pressed the woman for more identifying information, but all she said was that her name was Pam or Pamela Smith. Sergeant Allen asked her if Pam Smith was her real name, and she admitted it was not. He asked if she had been to Coyle's house, and she said she had been to the manager's office and then went to Coyle's house to feed his cats. Finally, Sergeant Allen asked if she had taken Coyle's truck, and her demeanor changed. She did not want to give Sergeant Allen any more information. She did not believe he was a cop, and she became uncooperative.

Meanwhile Officer Raymond Dias requested a "phone ping" of Coyle's phone. The phone returned a ping at the address where appellant was living. Officers Jarred Cotta and Christifer Barker were dispatched to appellant's residence to serve a search warrant. Inside appellant's house, officers found Coyle's phone, financial documents, driver's license, Social Security card, 11 credit cards, annuity paperwork, life insurance paperwork, a Kaiser Permanente health insurance card, four checkbooks, as well as numerous paperwork and bank statements.[2]

Appellant was not home. Officer Cotta called appellant, who said she was on her way to Los Angeles Airport, because her husband's mother had died, and they were leaving the country.

---

[2] The officers also found paperwork with the names Patty Medeiros, Brian Dobbs and April in the residence.

At the Los Angeles Airport, appellant and Mendoza missed their flight to El Salvador and were arrested by a Los Angeles Police Department officer. Detective Jason Gustin drove to Los Angeles to take appellant and Mendoza into custody. Detective Gustin *Mirandized*[3] appellant and questioned her. Initially, appellant asked why she was in custody, and said that she was dropping off her husband, Mendoza, at the Los Angeles Airport because his mother had passed away. Appellant then admitted she had gone to Hanford the day prior to get Coyle's mail and had spoken with the property manager.

Appellant claimed that on April 2 or 3, 2018, she had met Coyle for lunch. He told her that he had met two lesbians, and that they were going to take him to a business in Fresno to have some fun. She said Coyle wanted her to hold onto all of his belongings while he did this. Then appellant said she thought she needed to talk to a lawyer and refused to answer any further questions. Detective Gustin and Sergeant Vallin transported appellant back to Hanford.

Before leaving Los Angeles, appellant insisted she wanted to speak with Detective Gustin again. Detective Gustin advised her that she had exercised her right to an attorney, but appellant said she wanted to waive those rights and wanted to talk. Back in Hanford, Detective Gustin placed appellant in an interview room and admonished her pursuant to *Miranda*, *supra*, 384 U.S. 436. She agreed to speak to Detective Gustin.

Appellant began by saying that "they" were holding Coyle somewhere and were after Coyle's Thrift Savings Plan – a retirement account. She said that "they" were two brothers named Brian and Bolt and a prostitute named April. She did not know any last names but said Detective Gustin could find them by looking in her cell phone contacts. A search of appellant's phone revealed nothing.

After further questioning, appellant admitted to knowing where Coyle was. Before showing officers, however, appellant wanted to speak with Mendoza. Detective

_____

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Gustin said he wanted to find Coyle first to make sure he was okay. Appellant replied that there would be nothing left to find. Detective Gustin agreed to let appellant visit her husband, but she would need to take them to Coyle first.

Appellant took the officers to a dry canal bank in Madera County. Officers found burned household goods including a mattress and a couch cushion with the same pattern as the couch in Coyle's residence. Officers also found a human skull and a portion of an arm and a leg.[4]

After securing the burn site where Coyle's body was found, Detective Gustin transported appellant back to Hanford. Appellant met with Mendoza, and said, "I didn't tell them." Mendoza responded with, "Well, I did." Appellant asked Mendoza, "why?" and said that "she would take it all." She said she told officers about Bolt, Brian, and April and how they were after Coyle's money. Finally, she instructed Mendoza, " 'Don't admit to anything, you had nothing to do with this.' "

***Appellant's Confession***

On April 13, 2018, Sergeant Taylor Lopes of the Kings County Sheriff's Office questioned appellant. Appellant admitted that several days prior, she and a person she identified as "Bolt" went to Coyle's residence to steal his passwords and money. When they arrived, appellant grabbed a flashlight and a golf club, but put the golf club back. Bolt grabbed a BB gun and a hammer. They walked to Coyle's front door, which was unlocked, and went inside.

Appellant said once inside, she knocked on a panel to try and get Coyle's attention. Eventually, she called out to Coyle and said " 'Hey, it's me.' " Coyle came walking out of his bedroom, and Bolt pointed the BB gun at him and said, " 'Sit down, mother-fucker.' " Appellant also asked him to sit down, and Coyle complied. Appellant and Bolt began asking Coyle for his passwords and money. Bolt hit Coyle in the head

---

[4]    The parties stipulated that the remains found belonged to Coyle.

several times with the BB gun. Eventually, Coyle walked back to the bedroom and appellant and Bolt followed. At one point, Coyle gave them the information they wanted, and Bolt wrote it down.

In the bedroom, Coyle lay down on the bed and appellant used a dresser drawer to hit Coyle two times in the face. Bolt wanted to tie Coyle to the bed, and appellant helped use the cord from an electric blanket to do so. Bolt then wanted to place a bag over Coyle's head to suffocate him. They placed the bag from the electric blanket over Coyle's head, but it was too thick and eventually fell off.

Coyle kept looking at appellant and that made appellant uncomfortable, so she found several pairs of women's underwear and taped it over Coyle's eyes. At this point Coyle was shaking and blood was pouring from his head and face. Appellant put a blanket over Coyle and a towel underneath his head. Appellant said that Coyle was "starting to fade" and that "it needed to end." Bolt told Coyle that the reason he was feeling cold was because he was about to die.

Appellant grabbed what she described as an end table or small dresser and placed it on Coyle's head. Appellant explained that she did this to Coyle to kill him. After she placed the dresser on Coyle's head, Bolt grabbed a mini refrigerator and placed that on top of the dresser. Bolt then stood on top of the refrigerator and the dresser, placed his hands on the ceiling, and applied pressure to crush Coyle's head. Appellant braced Bolt so he wouldn't fall. Coyle's arm "raised" then fell and his leg dropped.

Appellant stated that she had gathered the courage to kill Coyle because she convinced herself she was protecting her children from him. Appellant did not provide any information concerning how to find Bolt.

### Mendoza's Testimony

Mendoza testified that appellant had told him she and Bolt went to Coyle's house to steal passwords to access a laptop. When Coyle refused to give them the passwords,

8.

Bolt and appellant hit Coyle with a BB gun and a dresser drawer until Coyle died. Mendoza said that appellant had taken items from Coyle's house, including credit cards. Mendoza used one of those cards to buy a plane ticket to El Salvador, and appellant used one card at a restaurant. Mendoza admitted the cards were used after he found out appellant had killed Coyle.

Mendoza stated that he went to Coyle's house after the murder with a U-Haul trailer to remove the body, because a woman named "April Striggles" was threatening to hurt appellant's children. Mendoza had never heard of or met Striggles prior to that day. Mendoza further stated that he never knew appellant to have a friend named "Bolt," but did know appellant had a friend named Brian who used to come to appellant's house.

Mendoza, appellant, and Striggles moved Coyle's body and bloody furniture from Coyle's house into the U-Haul, and appellant and Mendoza drove to a canal in Madera. Mendoza did not notice Striggles giving any orders or threatening appellant. Mendoza drove the U-Haul, and appellant followed in a car with appellant's children inside. Appellant and Mendoza unloaded everything near the canal and lit it on fire. On the way back, they stopped at a gas station and purchased bleach and gloves to clean the U-Haul. After they dropped off the U-Haul, they all went to a restaurant for dinner.

During cross-examination, Mendoza admitted that he had gone to Coyle's house before Coyle was killed. On redirect, Mendoza explained that at approximately 9:00 or 10:00 p.m. on the night before the murder, he had gone with appellant to Coyle's house to get some papers from Coyle. Mendoza was supposed to stay in the car with appellant's daughter. While appellant was inside Coyle's house, Coyle came back home. Appellant called Mendoza and asked him to distract Coyle so she could get out of the house because she was not supposed to be inside. Mendoza and appellant's daughter went to the front door and spoke with Coyle, who believed that appellant was in the house. Appellant was nonetheless able to get out without being detected. The following

9.

morning, appellant and Bolt killed Coyle. Appellant and Mendoza "cleared" Coyle's body three or four days later.

### *Appellant's Testimony*

Appellant testified in her own defense. Appellant identified Mendoza as "Bolt," and that she, Mendoza, and Brian went to Coyle's house to obtain passwords on the morning of the murder. At first, they tried to ask Coyle for the information, but he was hesitant. Mendoza then hit Coyle with a BB gun. Coyle was unwilling to give up the information, so appellant, Mendoza and Brian directed him to the bedroom. There, Mendoza hit Coyle on the head with a hammer. Eventually, Coyle gave them the information.

Mendoza wanted appellant to strike Coyle. Appellant was reluctant because she considered Coyle to be part of her family. Coyle had been to appellant's daughter's graduation and knew appellant's mother. Appellant said she picked up a dresser drawer and tried to hit Coyle but could not do it. Mendoza and Brian continued to hit Coyle. They put a plastic bag over Coyle's head and covered his eyes. Mendoza and Brian then placed an end table and a small refrigerator on Coyle's head, and Mendoza stood on top of both to kill Coyle. Appellant said she tried to leave, but Brian blocked her exit.

On cross-examination, appellant repeated the story that Coyle had met two lesbians who invited him to a business in Fresno. Appellant said she spoke to Coyle about it when they had lunch together. Appellant had trouble remembering her conversation with R.W. She also confirmed that she was in Coyle's house the night before the murder and took his laptop. Finally, she claimed that "Brian" was Mendoza's friend, but did not know his last name or where he lived.

10.

## DISCUSSION

### I. Appellant Waived Her Right to a Jury Trial on the Special Circumstance Allegation

Appellant argues that while she waived her right to a jury trial for the guilt phase of her case, she did not separately waive her right to a jury trial on the special circumstance allegation, as required by section 190.4. We disagree and find her jury trial waiver sufficient.

### A. Background: Appellant's Waiver

In agreeing to waive her right to a jury trial, appellant had the following exchange with the court:

> "[TRIAL COUNSEL]: Your honor, with respect to Stacie Mendoza, my client, I've spoken to [the prosecutor], she has indicated that she'd be willing to take the death penalty off the table if my client had agreed to waive a jury trial.
>
> "I've spoken extensively with my client regarding that and went over all of the consequences and the pros and cons and alternatives to making that decision whether to waive jury trial. And my client has decided to take advantage of that and actually waive jury trial, do a court trial instead.
>
> [¶ ] … [¶ ]
>
> "THE COURT: And if I understand it correctly, right now, with the special circumstance that's alleged, that could make the penalty for, if convicted of the murder, the penalty would be death. There's actually a separate trial that takes place, usually with the same jury, but it's called a penalty phase. So there's a guilt phase and a penalty phase. The first trial is the guilt phase. The second trial will be the penalty phase, and that's where a jury looks at mitigating evidence and aggravating evidence and ultimately decides what they think the appropriate penalty could be. And that could be death, it could be life without parole.
>
> "If the special circumstance isn't found true then it's neither of those, then it becomes either a second degree murder, which is 15 to life, a first degree murder is 25 to life.

11.

"So those are kind of the parameters of the life terms that are – well, the death term and the potential life terms. But that depends upon a finding of the special circumstance. Does that make sense to you?

"[DEFENDANT]: Yes, it does.

"THE COURT: So what the District Attorney is indicating is that if you want to waive your right to a jury trial, she'll remove the penalty of death as being a possibility, but the penalty of life without parole is still a possibility, as would be the 25 to life and the 15 to life, depending upon whether or not they prove beyond a reasonable doubt the special circumstance. Does that make sense to you?

"[DEFENDANT]: Yes, it does.

[¶ ] … [¶ ]

"THE COURT: Sure. So at this time do you want to waive your right to a jury trial but keep your right to a court trial?

"[DEFENDANT]: Yes, your Honor."

## B. Legal Standard

Section 190.4, subdivision (a), states in relevant part:

> "In case of a reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that is not true. The trier of fact shall make a special finding that each special circumstance charged is either true or not true. Whenever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime.

> "If the defendant was convicted by the court sitting without a jury, the trier of fact shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and by the people."

It is well established that "an accused whose special circumstance allegations are to be tried by a court must make a separate, personal waiver of the right to a jury trial." (*People v. Memro* (1985) 38 Cal.3d 658, 704 (*Memro*), revd. on other grounds by *People v. Gaines* (2009) 46 Cal.4th 172.) "The waiver must be made by the defendant personally, and must be 'separate'—that is, if the defendant is to be deemed to have waived the right to jury trial on both guilt and special circumstances, the record must show that the defendant is aware that the waiver applies to each of these aspects of trial." (*People v. Diaz* (1992) 3 Cal.4th 495, 565 (*Diaz*).)

The defendant's waiver does not have to be taken "in accordance with any particular procedure." (*People v. Wrest* (1992) 3 Cal.4th 1088, 1105 (*Wrest*).) It simply requires that the waiver on a special circumstance "actually cover[s] the special circumstance." (*Ibid.*)

## C. Analysis

### 1. The Advisement and Waiver Were Proper

At first glance, it appears *Memro* established a hardline rule that would require a defendant to separately and distinctly waive their right to a jury trial on a special circumstance allegation. (See *Memro, supra,* 38 Cal.3d at 704 ["Assuming an accused desires to waive his right to a jury as to both the guilt and special circumstance determinations, the trial court could satisfy section 190.4, subdivision (a)'s requirement by taking separate waivers as to each before commencement of trial"].) There, however, the defendant was not advised as to the special circumstance allegation whatsoever. (*Memro,* at p. 704, fn. 55.) Following *Memro*, our Supreme Court has clarified what qualifies as a "separate and distinct" waiver of the right to a jury trial on a special circumstance allegation.

In *Diaz*, the defendant was advised as follows:

> " '[Y]ou'll be giving up that right to have the jury in two different functions. First of all, first function is to decide the question of your guilt or innocence. Then the second function, similarly, assuming there are 12 of them and they would unanimously agree that you were guilty, then you would have 12 jurors who must unanimously agree as to the punishment.

They have a choice, life without possibility of parole or death. … And you'll be giving up that rights. Defendant answered, 'I'm giving it up.' The court asked defendant if he understood that the waiver applied to 'both phases ... of the special circumstances case.' Defendant assented." (*Diaz, supra,* 3 Cal.4th at p. 564.)

The *Diaz* court found, while not a model of clarity, "the trial court explained to defendant that the waiver of his right to trial by jury applied to *all* aspects of his special circumstances case, from beginning to end. Defendant also told the court that he had discussed the matter 'quite thoroughly' with his counsel." (*Diaz, supra,* 3 Cal.4th at p. 565.) Our Supreme Court concluded that the advisement "was sufficient to advise defendant that his waiver, which included all aspects of guilt and penalty, included within it a waiver of the right to jury trial on the truth or falsity of the special circumstance allegation." (*Ibid.*)

In *Wrest*, the defendant was advised by the prosecutor as follows:

" '[The Prosecutor]: You understand you have a right to a trial by jury, which means that 12 citizens selected by your lawyer and by myself would hear all the facts of this case and decide whether or not you were guilty of the charges, the enhancements, *the special allegations, or any other special allegations that are charged in this particular case?*

" 'Do you understand that?

" '*The Defendant: Yes.*

[¶ ] … [¶ ]

" '[The Prosecutor]: By initialing that box [indicating the jury waiver box on the waiver form] you're indicating that you did hereby waive and give up your right as to the charges we've discussed earlier, any enhancements *and special allegations that we've already talked about; is that right?*

" '*The Defendant: Yes.*

" '*[The Prosecutor]: In other words, you don't want a jury trial on the issue of guilt or the special circumstances or the enhancements, right?*

" '*The Defendant: Right.*

14.

" '[The Prosecutor]: And you've discussed that with your lawyer …?

" 'The Defendant: Yes.' " (*Wrest, supra,* 3 Cal.4th at pp. 1103-1104.)

The *Wrest* court found "[t]he dialogue set forth above, considered in light of the remainder of the record preceding the acceptance of appellant's plea, reflects an express and personal understanding and waiver of appellant's right to jury trial on the special circumstance allegations. The mere fact that the prosecutor's questions combined issues of guilt, special circumstances, and enhancements did not vitiate the waiver." (*Wrest*, *supra*, 3 Cal.4th at p. 1104.)

In *People v. Sivongxxay* (2017) 3 Cal.5th 151 (*Sivongxxay*), the trial court's advisement did not contain any reference to special circumstances. The defendant was advised he had: " 'a right to a trial, either by a jury of 12 people selected from this community, through a process that you would engage in with your attorneys, the district attorney and the Court, or a trial in front of a judge, acting alone without a jury. The burden of proof remains the same. The district attorney has the burden to go forth with evidence sufficient to prove your guilt beyond a reasonable doubt. Then, and only then, would we get to a penalty phase.' " (*Id.* at p. 165.)

The *Sivongxxay* court found "the colloquy fell short of what the applicable statutes, as construed in *Memro*, require. There was no specific reference in the waiver colloquy to the need to adjudicate the special circumstance allegation; the term 'special circumstance' was never mentioned at all. Although such precision is not required for a knowing, voluntary, and intelligent waiver, we believe that *Memro's* requirement of a 'separate waiver,' even as that rule was subsequently clarified in *Diaz* and *Wrest*, demands at least that much specificity." (*Sivongxxay, supra,* 3 Cal.5th at pp. 177-178.)

Finally, *People v. Morelos* (2022) 13 Cal.5th 722 at pages 759-760, which is particularly instructive to the case at bench, the defendant was advised he was entitled to " '12 individuals to make the factual determination both as to your guilt and in the event

15.

that that jury would find you guilty *and determine one or more special circumstance to be true*, that you would have a constitutional right to a jury to determine the penalty for which the crimes would be punishable.' " Our Supreme Court concluded, "[t]his express reference to a jury finding on the special circumstance allegations shows that [defendant] was 'aware that the waiver applie[d] to each of these aspects of trial.' " (*Ibid*.) "There was no need for a separate interrogation about the special circumstance jury trial rights." (*Ibid*.)

Here, appellant was advised "with the special circumstance that's alleged, that could make the penalty for, if convicted of the murder, the penalty would be death. There's actually a separate trial that takes place, usually with the same jury, but it's called a penalty phase. So there's a guilt phase and a penalty phase. The first trial is the guilt phase. The second trial will be the penalty phase, and that's where a jury looks at mitigating evidence and aggravating evidence and ultimately decides what they think the appropriate penalty could be. And that could be death, it could be life without parole."

Appellant was further advised that "[i]f the special circumstance isn't found true then it's neither of those, then it becomes either a second degree murder, which is 15 to life, a first degree murder is 25 to life," but that the sentence would ultimately depend on "whether or not [the prosecutor proves] beyond a reasonable doubt the special circumstance." Appellant's attorney represented that they spoke extensively with appellant about the consequences of waiving a jury trial.

In contrast to *Memro* and *Sivongxxay*, where the defendants did not receive any advisement whatsoever about their right to a jury trial on the special circumstance allegations (see *Memro, supra,* 38 Cal.3d at p. 704 & *Sivongxxay, supra,* 3 Cal.5th at pp. 177-178), here, appellant was properly advised and separately and distinctly waived her right to a jury trial on the special circumstance allegation. She was advised that the special circumstance allegation must be proven true beyond a reasonable doubt during the

16.

guilt phase of the trial. And, should the allegation be found true, appellant was told that she could face the death penalty during the penalty phase.

Appellant was also advised that the guilt and penalty phases are separate trials. Both appellant and trial counsel represented that they spoke extensively about the consequences of appellant waiving her jury trial right. This portion of the trial court's advisement brings the instant case in line with *Diaz*. There, the trial court's advisement and the defendant's thorough discussion with his counsel were sufficient to render proper the defendant's waiver of his jury trial right of the special circumstance allegation. (*Diaz, supra,* 3 Cal.4th at p. 565.)

Appellant argues the trial court failed to explicitly address her right to a jury trial on the special circumstance allegation. However, the mere fact that an advisement combines "issues of guilt, special circumstances, and enhancements [does] not vitiate the waiver." (*Wrest, supra,* 3 Cal.4th at p. 1104.)

Appellant further argues that because the plea colloquy contained no reference to the need to adjudicate the special circumstance allegation, error occurred. Appellant overlooks the fact that the trial court advised her that her sentence would depend on "whether or not [the prosecution proves] beyond a reasonable doubt the special circumstance."

Contrary to Mendoza's assertion, the court was not required to separately interrogate appellant about her right to a jury trial on the special circumstance allegation. (See *People v. Morelos, supra,* 13 Cal.5th at p. 759.) The trial court's advisement that the special circumstance allegation needed to be found true beyond a reasonable doubt during the guilt phase, and appellant's subsequent waiver of a jury trial as to the guilt phase, constituted a sufficient waiver of her jury trial right on the special circumstance allegation.

## 2.  Any Presumed Error is Harmless

The failure to secure a proper waiver of the right to a jury trial on a special circumstance allegation, or "*Memro* error," is subject to harmless error analysis if the defendant otherwise personally entered a knowing, intelligent, and voluntary jury waiver as to all aspects of his or her trial.  (*Sivongxxay, supra,* 3 Cal.5th at p. 187.)  "The California Constitution imposes upon this court an obligation to conduct 'an examination of the entire cause' and reverse a judgment below for error only upon determining that a 'miscarriage of justice' has occurred."  (*Id.* at p. 178, citing Cal. Const., art. VI, § 13.)  A defendant must therefore demonstrate it was "reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

In the context of a *Memro* error, this court reviews the record "to ascertain whether it reveals a reasonable probability that the defendant would have opted for a jury trial of the special circumstance allegation, had no *Memro* error occurred."  (*Sivongxxay, supra,* 3 Cal.5th at p. 187.)  In this case, any presumed error was clearly harmless.

Appellant's waiver was part of an agreement reached with the prosecutor to remove the death penalty as a potential sentence.  Even in the absence of *Memro* error, the record does not reflect a reasonable probability that appellant would have opted for a jury trial of the special circumstance allegation, because doing so would have deprived her of the benefit of the bargain reached with the prosecutor.  We reject appellant's unsupported assertion to the contrary.

## I.  Substantial Evidence Supports Appellant's Conviction for First Degree Murder

Appellant argues there is insufficient evidence that she harbored the necessary mental state to support her conviction for first degree murder.  She contends that she did not personally participate in Coyle's death, and that the murder was planned and executed solely by Mendoza.  Appellant submits that the trial court's finding that she was not the

actual killer supports her argument that she lacked the requisite intent to support her murder conviction. We find there is substantial evidence that appellant aided and abetted first degree murder with an intent to kill.

## A. Relevant Factual Background

At the conclusion of appellant's criminal trial, the trial court made the following findings:

> "I do find that the People have not proven beyond a reasonable doubt that the defendant was the actual killer. However, the People have proven beyond a reasonable doubt that during her assistance in the robbery, as well as the homicide, that the defendant herself had malice aforethought and intended to kill, and that she then aided and abetted and assisted the perpetrator in the commission of the first degree murder.

> "It also appears to me that it's been proven beyond a reasonable doubt that she was a major participant in the robbery and that when she participated in the robbery that she acted with, at the minimum, with reckless indifference to human life and therefore she is guilty of murder in the first degree."

## B. Legal Standard

On appeal, the reviewing court "must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) We "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) A murder committed in the perpetration of or attempt to perpetrate robbery is murder in the first degree. (§ 189, subd. (a).) To be guilty of first degree murder, a participant in an enumerated felony where death occurs is liable only if

19.

"[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of the murder in the first degree" or "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(2)-(3).)

## C. Analysis

Appellant argues that when the trial court found that she was not the actual killer, the court necessarily rejected the implication that appellant personally participated in Coyle's death. Consequently, a rational trier of fact could not go on to conclude that appellant acted either with intent to kill or with reckless disregard for life during the robbery.

We disagree. The record shows a reasonable trier of fact could find that appellant aided and abetted Coyle's murder with intent to kill.[5] Appellant admitted she was involved in an ongoing scheme to rob Coyle. Appellant confessed to her gruesome, continuous participation in Coyle's assault. She confessed to beating Coyle in the face with a dresser drawer, to tying him to his bed and putting a bag over his head, and finally, to placing furniture on Coyle's head, and bracing Bolt as he crushed Coyle's head. Appellant confessed that near the end of the assault she wanted it to "end" and that she put the furniture on Coyle's head to kill him. Although appellant presented testimony different from her confession at trial, the court found appellant guilty of aiding and abetting first degree murder with intent to kill, and therefore did not find her testimony credible. Appellant's participation in the disposal of Coyle's body and personal effects, and continuous attempts to cover up the crime, and subsequent attempts to steal even

---

[5] Appellant does not separately challenge whether substantial evidence supports the special circumstance finding, and therefore has forfeited the issue. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549.)

more of Coyle's belongings, including his *house*, further undermined appellant's credibility.  Finally, Mendoza corroborated appellant's confession.

The evidence in this case is more than sufficient to support appellant's first degree murder conviction.

## **<u>DISPOSITION</u>**

The judgment is affirmed.

                SMITH, J.

WE CONCUR:


LEVY, Acting P. J.


SNAUFFER, J.